IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CORI LOPEZ, MICHAEL GUERRA, RASHAAN HARRIS, §
DONNY ITTY, CHARLES KELL, BRANDON KENNEDY, §
QUANG LE, LUIS FERNANDO LEIJA, DANNY RAY §
LEWIS, NICHOLAS ALBA LOPEZ, TUYET LY, JOSE §
ANTONIO MALTEZ, SANDRA MEJIA, CARLOS MARIO §
MORALES, CHRISTINE NGUYEN, JOSEPH TAI §
NGUYEN, TAM NGUYEN, RAUL DARIO QUANEDO, §
GUILLERMO PADRON, DARIO ISRAEL PALACIOS, §
ARMANDO GONZALEZ PEREZ III, KIM PHAM TOAN §
PHAN, CHRISTOPHER DWAYNE PRICE, MARK §
RAMIREZ, ALFRED J. RAMSEY, KENDRICK REECE, §
ALEXANDER REVELO,  JOSE REYES, OSCAR RIVERA, §
IRENE RODRIGUEZ, JOSE L. RODRIGUEZ, JOSHUA §
MARC ROLLER, MARIA TERRAZAS, DENNIS JEFF §
VASQUEZ, PAUL VO, THOMAS VO, JASON P. §
WILLIAMS, JEREMY WILLIAMS, RONALD §
WILLITZER, DAVID GARZA, JESSE GARZA, §
JOHNNY J. GIL, ALBERTO GOMEZ, EDDIE §                CIVIL ACTION NO. 03-2297
GONZALES, IGNACIO GONZALES, JOSEPH §
GOUDEAU, FERNANDO BAHENA, JUAN CARLOS §
BEHENA, LUIS BAHENA, JACOB BLACKBURN, §
MICHALE RYAN BOVIE, CAROLS CAMPOS, JUAN §
CASTANEDA, HUGO JUAREZ CASTRO, JUAN JUAREZ §
CASTRO, WILLIAM CAVIN, DENNIS CHIM, §
CHRISTOPHER CLAYPOOL JOSE CORTES, DUSTIN §
DODSON, RANDALL GRAY, and TERJANDRO §
FONTENOT, §
§
         Plaintiffs, §
§
v. §
§
THE CITY OF HOUSTON, *et al.*, §
§
         Defendants. §

MEMORANDUM AND ORDER

# TABLE OF CONTENTS

I.      Background ....................................................................................   2

II.     Summary Judgment Standards................................................   6

III.    Section 1983 Claims Against City of Houston.....................   8

        A.    Background on Smith Plan and Jackson Plan.........................   10
        B.    Detention Without Reasonable Suspicion...............................   17
        C.    Analysis of Formal City Policies............................................   21
              1.    Analysis of Facial Constitutionality of City Policies....................   24
                    a.    "Zero Tolerance" Policy....................................   25
                    b.    Smith Plan.......................................................   26
                    c.    Jackson Plan....................................................   27
              2.    Analysis   of   Constitutionality   of   Facially   Innocuous   City
                    Policies...............................................................................   37
                    a.    "Zero Tolerance" Policy....................................   38
                    b.    Smith Plan.......................................................   38
        D.    Analysis of Informal Policy:  Evidence of a Recurring Pattern to
              Show a Custom or Practice........................................................   39
              1.    Arrest Without Probable Cause.......................................   40
              2.    Detention Without Reasonable Suspicion......................   43
        E.    Municipal Liability Based on Single Incident of Arrests Without
              Probable Cause............................................................................   52
        F.    Failure to Supervise and Failure to Protect Claims ...............   55
              1.    Legal Standards ................................................................   56
              2.    Analysis of Failure to Supervise Allegedly Causing Unlawful
                    Detention ................................................................   58
                    a.    Absence of Supervision ...................................   58
                    b.    Causal Link Between the Failure to Supervise and
                          Violation of Plaintiffs' Rights .........................   60
                    c.    Deliberate Indifference ....................................   61
              3.    Analysis of Failure to Supervise Allegedly Causing Wrongful
                    Arrest, Excessive Force, and Custodial Abuse ........................   65
              4.    Conclusion on Failure to Supervise Claims ............................   66
              5.    Analysis of Failure to Protect Claims ........................................   67
        G.    Conspiracy ...............................................................................   67
        H.    Conclusion on Claims Against City....................................   68

continued . . .

. . . continued

IV.   Claims Against Bradford ............................................................................   68

    A.   Section 1983 Claims Based on Policy or Practice.................................   69

    B.   Section 1983 Claims Based on Failure to Supervise and Failure to
        Protect ................................................................................................   74

    C.   State Law Claims ...............................................................................   76

V.   Conclusion and Order.....................................................................................   78

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| CORI LOPEZ, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-2297 |
| | § | |
| THE CITY OF HOUSTON, *et al.,* | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court in this civil rights dispute arising from the August 2002 arrest of Plaintiffs is a Motion for Summary Judgment [Doc. # 134] ("Defendants' Motion") filed by The City of Houston (the "City") and former Chief of Police C.O. Bradford ("Bradford").[1]  Plaintiffs have filed a Response [Doc. # 144] ("Plaintiffs' Response"), to which Defendants have filed a Reply [Doc. # 151].  Plaintiffs have filed a Response to Defendants' Reply [Doc. # 160].  This motion is ripe for decision.  Having considered the parties' submissions, all matters of record, and the applicable legal authorities, the Court concludes that Defendants' Motion should be **granted in part and denied in part**.

---

[1]     In addition to the City and Bradford, HPD Captain Mark Aguirre remains a Defendant in this case.  All other Defendants have been dismissed.

P:\ORDERS\11-2003\2297M&O.msj   050725.1540

## I.    **BACKGROUND**

The following facts are alleged in Plaintiffs' Second Amended Complaint.  On the evenings of August 17 and 18, 2002, Houston Police Department ("HPD") officers orchestrated a surprise raid upon the parking lots of a K-Mart retail store and Sonic Drive-In restaurant located at the 8400 block of Westheimer Road in Houston, Texas.  Sixty-two of the Plaintiffs in this case[2] allege that approximately seventy-seven armed police officers, backed up by helicopters, two tow trucks and jail transports, descended upon the parking lot and indiscriminately arrested Plaintiffs and everyone else on the premises – two hundred seventy-eight people.  At the Sonic, HPD officers brandished pistols and shotguns in the faces of customers, verbally abused them, knocked drinks and food from their hands and off their tables, and ordered them to move to a designated location in the parking lot.  Those who were eating in their cars were hauled from their vehicles at gunpoint and herded to the designated location.  Those at the K-Mart were treated similarly.  Police also rounded up the passengers of cars stopped at a traffic light waiting to leave the parking lot.  All were forced

---

[2]    These plaintiffs are Cori Lopez, Michael Guerra, Rashaan Harris, Donny Itty, Charles Kell, Brandon Kennedy, Quang Le, Luis Fernando Leija, Danny Ray Lewis, Nicholas Alba Lopez, Tuyet Ly, Jose Antonio Maltez, Sandra Mejia, Carlos Mario Morales, Christine Nguyen, Joseph Tai Nguyen, Tam Nguyen, Raul Dario Oqunedo, Guillermo Padron,  Dario Israel Palacios, Armando Gonzales Perez III, Kim Pham, Toan Phan, Christopher Dwayne Price, Mark Ramirez, Alfred J. Ramsey, Kendrick Reece, Alexander Revelo, Jose Reyes, Oscar Rivera, Irene Rodriguez, Jose L. Rodriguez, Joshua Marc Roller, Maria Terrazas, Dennis Jeff Vasquez, Paul Vo, Thomas Vo, Jason P. Williams, Jeremy Williams, Ronald Willitzer, David Garza, Jesse Garza, Johnny J. Gil, Alberto Gomez, Eddie Gonzales, Ignacio Gonzales, Joseph Goudeau, Fernando Bahena, Juan Carlos Bahena, Luis Bahena, Jacob Blackburn, Michael Ryan Bovie, Carlos Campos, Juan Castaneda, Hugo Juarez Castro, Juan Juarez Castro, William Cavin, Dennis Chim, Christopher Claypool, Jose Cortes, Dustin Dodson, and Randall Gray.

into a containment area.  The officers refused to examine receipts as proof of legal entry on the property or listen to the detainees' explanations.  Among those caught up in the raid were children shopping with a parent, an off-duty air traffic controller, and honor students including a class valedictorian.

The detainees were placed under arrest for "attempted trespassing" and handcuffed with tight plastic zip ties.  When some complained, officers further tightened the cuffs.  As a result, many of the arrestees suffered bruising, swelling, and numbness of the wrists, hands and arms.  They were searched.  Some of the female arrestees were searched in front of male officers and were the subjects of jests and humiliation.  They were divided by sex, with brothers separated from sisters, children from parents.  Then the arrestees were forced to sit or kneel for hours on the ground beside garbage bins on the hot summer nights in question.  Some needed to use the restroom and were forced to soil themselves when this basic dignity was denied. The last of the arrestees were not transported out of the parking lot until approximately six in the morning.  Some suffered dehydration.

Plaintiff Alberto Gomez, a diabetic, was ignored when he told officers he needed to eat.  When he went into diabetic shock, officers accused him of being "on drugs."  Finally, a paramedic rescued Gomez, and he spent fourteen hours in the hospital as a result of the officers' delay.

 The arrestees were transported to jail in hot, overcrowded buses. At the prison, many were forced to wait outside for several hours while those inside were processed.  Inside, they were packed body-to-body in holding cells with dangerous criminals.  The cells stank of

3

sweat, urine, feces, and vomit, the toilets were open to public view, and were filthy and overflowing.  The prisoners faced the Hobson's choice of sitting in filth or standing for the entire length of their confinement.  Jail personnel and officers verbally jeered at them.  Those who complained were processed last.  Those who refused to plead guilty were not taken before a magistrate.  Plaintiffs spent differing amounts of time in prison; some were released after as few as four hours; many were imprisoned in excess of twenty hours.  The last arrestee remained jailed until Monday morning, August 19, 2002.

Many of Plaintiffs found that their vehicles had been towed from the K-Mart and Sonic parking lots.  They had to pay fees to retrieve them.  Some vehicles were damaged.

As a warm-up for the K-Mart arrests on the prior evening, August 16, 2002, HPD officers orchestrated a surprise raid upon the James Coney Island restaurant on the 5700 block of Westheimer Road.  During that operation, the officers arrested at least twenty-five patrons, including Plaintiff Terjandro Fontenot.  As with the raids of August 17 and 18, HPD officers accused the patrons of "attempted trespassing," but refused to examine their receipts as proof of their status as invitees on the property.  Moreover, Fontenot claims that no authorized personnel of James Coney Island asked the customers to leave the premises before the arrests took place.  Fontenot and the other patrons were summarily handcuffed with plastic zip ties and transported to jail.  Fontenot claims that the zip ties that bound his hands were so tight that his fingers and wrists were numb for over three weeks following his arrest.  He also claims that the stress of the ordeal caused him to suffer a hiednal ulcer attack and Barretts reflux accompanied with a large blood loss.

At each of the raids, arresting officers signed arrest affidavits without personal knowledge of facts establishing probable cause to arrest. Plaintiffs claim that the officers knew or should have known that they were not guilty of attempted trespassing. Of the two hundred seventy-eight arrests made on the evenings in question, one was for misdemeanor possession of marijuana and one was for parole violation. All the "attempted trespassing" charges against the rest of the arrestees were ultimately dismissed as wrongful arrests. There were no arrests for public intoxication, vandalism, drag racing, trespassing, or any other crime.

Plaintiffs allege that their arrests were made pursuant to an HPD exercise dubbed "Operation ERACER," mass arrests on August 16, 17, and 18, 2002 intended to target illegal street racing. All Plaintiffs allege that the operations were conducted by Captain Mark Aguirre with the knowledge and express or implied authorization of Chief C.O. Bradford. Plaintiffs further allege that the arrests were made pursuant to an express or implied policy of HPD known as "zero tolerance." Pursuant to this alleged policy, HPD targets an area and arrests anyone and everyone in the area without regard for probable cause or evidence of criminal activity.

There is no evidence before the Court that any street racing occurred on the evenings in question.

Plaintiffs assert causes of action pursuant to 42 U.S.C. § 1983 against the City, Bradford, and Aguirre for constitutional civil rights violations. Plaintiffs claim three bases for the City's liability under § 1983: (1) execution of a policy, custom or practice that

deprived them of constitutionally protected rights; (2) a custom or practice, not formally approved, but so widespread that it takes the force of law, that deprived them of constitutionally protected rights; and (3) insufficient supervision of HPD employees resulting in the deprivation of their constitutional rights.  Plaintiffs also assert a "conspiracy" claim against all Defendants.  The constitutional rights that Plaintiffs assert arise under (1) the Fourth Amendment's prohibition against unlawful detention and arrest, (2) the Fourth, Fifth, Eighth, and Fourteenth Amendment's prohibition against the use of excessive force and against custodial abuse, and (3) the Fourteenth Amendment right to due process of law. Plaintiffs also assert a state law cause of action against Bradford and Aguirre for the intentional tort of false arrest and imprisonment.

## II.   <u>SUMMARY JUDGMENT STANDARDS</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  An issue is material if its resolution could affect the outcome of the action.  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be  reviewed in the light most favorable to the nonmoving party.  *Hotard v. State Farm Fire & Cas. Co.,* 286 F.3d 814, 817 (5th Cir. 2002). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial.  *Smith  v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial."  *Id.*  If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* (quoting *Smith v. Brenoettsky*, 158 F.3d 908,

911 (5th Cir. 1998)); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that "unsworn pleadings do not constitute proper summary judgment evidence," quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994)). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir. 1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## III.   SECTION 1983 CLAIMS AGAINST THE CITY

Plaintiffs claim in their Second Amended Complaint ("Complaint") that they were illegally detained and arrested pursuant to HPD's formal or informal "zero tolerance" policy and formal HPD plans utilizing "zero tolerance" to target street racing. Plaintiffs also assert claims against the City based on the City's alleged failure to supervise HPD staff. Plaintiffs also assert a claim for "conspiracy" under § 1983.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Thus to establish liability under § 1983 there must be (1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor. *Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004).

There are essentially five avenues for establishing local government liability under § 1983. A plaintiff may assert liability based on: (1) an illegal official governmental policy or decision; (2) an illegal custom or practice within the government; (3) a custom or policy of inadequate training, supervision, discipline, screening, or hiring; (4) illegal conduct of an official with final policymaking authority; or (5) a municipality's ratification of illegal acts. *See Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 694 (1978) (municipality may be held liable under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."); *City of Canton v. Harris*, 489 U.S. 378, 385-87 (1989) (inadequacy of training may serve as basis for liability where failure to train amounts to deliberate indifference to rights of persons); *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 736-37 (1989) (municipality liable for isolated actions or decisions of its employee only where the employee has "final policymaking authority" such that decision represents official policy); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (finding

municipal liability based on city's failure to reprimand or discharge officers after their egregious conduct).  *See generally* Karen M. Blum, *Local Government Liability Under Section 1983,* 715 PLI/Lit 7 (2004).  Plaintiffs' Response incorporates arguments based in the first four grounds for liability.

### A.    Background on "Smith Plan" and "Jackson Plan"

The City argues in its motion for summary judgment that Plaintiffs have no evidence of an illegal formal or informal city policy.  Central to Plaintiffs' claims regarding City policy are the "Smith Plan"[3] and the subsequent "Jackson Plan,"[4] operational policies for anti-street racing initiatives that both called for implementation of "zero tolerance."  Before the Court discusses the merits of the City's arguments, an explanation of the factual background about the two plans is necessary.  As this is a motion for summary judgment, the Court considers the evidence in the light most favorable to Plaintiffs, the nonmovants.

It became apparent to HPD and the City around May 2000 that a large number of import vehicles were being stolen to replace auto parts damaged during the course of illegal street racing.[5]  In addition, the City attributed to street racing several automobile accidents involving fatalities.  HPD concluded that racing had grown to an "epidemic" level, and was creating public nuisances such as noise and air pollution, large crowds trespassing on private

---

[3]    *See* Memorandum dated May 30, 2002 from S.A. Smith to J.L. Breshears, Exhibit 22 to Plaintiffs' Response (the "Smith Plan").

[4]    Memorandum dated Aug. 1, 2002 from F.S. Jackson to Officers and Supervisors, South Patrol Command, Exhibit 24 to Plaintiffs' Response (the "Jackson Plan").

[5]    Smith Plan, at 1.

property, and damage to public and private property.[6]  The City received a "number" of citizen complaints regarding at least one clandestine drag racing location, and managers of at least one business found it necessary to hire off-duty police officers to patrol their parking lot to keep it free of racers and racing enthusiasts.[7]

At a departmental meeting on April 18, 2002, Chief Bradford questioned his officers regarding what was being done about the growing problem of illegal street racing.[8]

Aguirre suggested that HPD deal with the street racing problems by "implementing Zero Tolerance tactics, mass arrests, and towing vehicles to send a message to those individuals involved in such activities and hit them in their pocketbooks."[9]  Bradford praised the recommendation publicly at the meeting.  There is an indication that, during this April 18 discussion, Bradford apparently stated that HPD's legal department did not need to review every proposed plan of action, thereby suggesting the anti-street racing initiatives did not need legal department approval.[10]

On May 13, 2002, Aguirre submitted to Bradford through the chain of command a proposal to Eliminate Street Racing, which he dubbed "Operation ERACER" (Eliminate and

---

[6]     *See id.*; Memorandum dated July 2, 2002 from S.A. Smith to J.L. Breshears, Exhibit 23 to Plaintiffs' Response, at 1 (the "Smith Evaluation"); Memorandum dated May 13, 2002 from M.A. Aguirre to C.O. Bradford, Exhibit 25 to Plaintiffs' Response, at 1.

[7]     *See* Smith Evaluation, at 1.

[8]     Investigation Summary, Exhibit 5 to Plaintiffs' Response, at 208.

[9]     *Id.*

[10]    *Id.*

Remove Autos Causing Environmental Ravagement).[11] Aguirre's plan called for use of "zero tolerance" in an operation to take place at an undetermined date.  Executive Assistant Chief J.L. Breshears testified that he rejected this plan, in part because it did not include a surveillance component.[12]

On May 30, 2002 Captain S.A. Smith submitted to Breshears a plan of action for a "Street Racing Initiative," with planned overt operations led by Captain Smith tentatively set for the weekends of June 21 and June 28, 2002.  For clarity and ease of reference, the Court will refer to the May 30 document as the "Smith Plan," and to the planned operation as the "Smith Initiative."  The Smith Plan called for a covert phase consisting of three weekends of undercover surveillance to collect evidence and establish probable cause prior to the second phase, the overt operation.  The Smith Plan's overt operation called for "[a]rrest teams [to] conduct zero tolerance sweeps through any identified street racing sites and/or staging areas."  Bradford himself approved the Smith Plan as submitted to him in writing.[13] Bradford designated the Smith Plan as the "model" plan and gave Breshears authority to approve any plan that complied with it.[14]

---

[11]     Memorandum dated May 13, 2002 from M.A. Aguirre to C.O. Bradford, Exhibit 25 to Plaintiffs' Response.

[12]     Deposition of J.L. Breshears, Exhibit 38 to Plaintiffs' Response, at 75-76; Deposition of J.L. Breshears, Exhibit 36 to Plaintiffs' Response, at 82-83.June 7, 2005

[13]     Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98.

[14]     Smith Evaluation, at 3.

Overt operations were carried out for the Smith Initiative on June 15 and June 22, 2002.  Thereafter, Smith drafted an evaluation dated July 2, 2002 for Executive Assistant Chief Operations Coordinator Breshears (the "Smith Evaluation").  Smith reported that his June 15 operation had involved a mass detention of all persons congregating in certain retail parking lots:

> [U]ndercover officers placed the vehicles in strategic positions from which, upon command, they could effectively block all exits from the raceway. Within one minute, officers in marked units converged on each exit location clearly displaying an overwhelming police presence.  A single exit, manned by both uniformed and plainclothes officers was created.  Uniform and non-uniform personnel contained in excess of three hundred and fifty vehicles with an area that provided no less than eight separate avenues of escape.  Estimates provided by helicopter patrol surveillance indicate that no more than eight vehicles escaped the perimeter established by police.  The occupants of each vehicle were interviewed within a period of less than two hours, and the scene was cleared.[15]

Smith also reported in the Evaluation that on Saturday, June 22, 2002, undercover officers observed violations related to racing and reckless driving, resulting in numerous citations and arrests.  The Smith Evaluation does not state whether HPD conducted a mass detention on June 22, 2002.[16]  Breshears testified that he discussed the Smith Evaluation and the results of the Smith Initiative with his subordinate commanders, including Assistant Chief C.A. McClelland, characterizing the Smith Initiative as "successful."[17]

---

[15]     *Id.* at 3.

[16]     *Id.*

[17]     Deposition of J.L. Breshears, Exhibits 51, 66 to Plaintiffs' Response, at 93, 157.

McClelland testified that he told Bradford and Breshears he intended to run a street racing initiative.[18]  McClelland gave approval to Aguirre to devise a new street racing plan, a task which Aguirre then delegated to Lieutenant Frank S. Jackson.[19]  Jackson issued a memorandum dated August 1, 2002 (the "Jackson Plan") containing plans to implement Operation ERACER, set for the weekend of August 16, 2002.  The "Jackson Plan" stated that McClelland had approved and authorized a plan of action for Operation ERACER.[20]  The Jackson Plan purported to rely on prior surveillance and included the use of undercover officers to identify those participating in illegal activity.   It also employed the "zero tolerance" mass detention strategy that had been put into practice in the Smith Initiative:

> Zero Tolerance will be the strategy utilized to combat this problem.  All exits to the area will be blocked and closed by units designated for containment.  All vehicles within the containment area will be inspected and scrutinized for violations.  Each vehicle will be directed toward a specified exit.  As the vehicles leave the containment area, they will be divided into groups.  Those identified as 'racers' will be arrested for the violations committed and the vehicles will be inventoried and towed to a certified storage lot.  Those vehicles containing juveniles or persons found to be consuming alcoholic beverages will be addressed in the same manner.  Those believed to be spectators should be directed toward the exit of a parking lot.  Once they are on the street, the drivers may be checked for driver's license and insurance.

---

[18]     Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127.

[19]     Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70.

[20]     McClelland later stated in a memorandum that he approved the Jackson Plan.  *See* Memorandum from C.A. McCleland to All Captains, South Patrol Command dated Aug. 12, 2002, Operation ERACER, Exhibit 45 to Plaintiffs' Response.

> The vehicles may be checked for registration and inspection sticker.  Citations
> will be issued for all violations discovered during the course of the operation.[21]

Plaintiffs' evidence suggests that at some point in Operation ERACER's planning stage, communication among certain of the superior HPD officers broke down.  An HPD internal investigation concluded that Aguirre "never planned to adhere to an unrealistic standard [outlined in the Jackson Plan] of having his officers establish independent probable cause for each person arrested at 8400 Westheimer.  [Aguirre] planned for the Surveillance . . . Teams to identify legitimate customers.  Everyone else found within the containment area went to jail."[22]  In other words, Aguirre shifted the Plan in a fundamental way – from the assumption that all would be detained, but only those observed violating the law would be arrested – to the assumption that not only would everyone be detained, but all except those persons specifically observed behaving legally would be arrested.

Aguirre also added the crime of trespassing to the list of violations for which police would be scrutinizing the crowds.  More specifically, during the Smith Initiative, persons were arrested or cited for reckless driving, traffic violations, curfew violations, outstanding warrants, public intoxication, and DWI, crimes that officers actually observed.[23]  The Jackson Plan called for arrests of persons seen committing violations of law, such as those

---

[21]     Jackson Plan, at 3.

[22]     Investigation Summary, Exhibit 75 to Plaintiffs' Response, at 375.

[23]     Smith Evaluation, at 3.

identified as street racers, juveniles,[24] and persons consuming alcoholic beverages.[25]  Under Aguirre's direction, Jackson subsequently added a trespass component to the plan for Operation ERACER in a document dated August 16, 2002, known as the "Game Plan."[26] Jackson stated in the Game Plan:  "Make no mistake in the intent of the project; this is a Zero Tolerance operation.  Trespass Affidavits have been obtained for each location described and the no trespass signs have been posted.  The majority of the arrests will be for the city ordinance of trespass remaining . . . ."[27]  This decision proved problematic for the City and Aguirre, as (1) some of the sites actually targeted were open businesses with legitimate customers; and (2) one element of the crime of trespassing is failure to leave the property when asked,[28] while the Jackson Plan called for containment of all persons without any instruction to visitors to exit the premises or opportunity to do so before detention and possible arrest.

Plaintiffs have not identified any evidence suggesting that a City policymaker saw the Game Plan prior to the events at issue in this case, nor that the Game Plan was *per se* approved by a policymaker.

---

[24]     Presumably, this refers to minors violating Houston's curfew laws.

[25]     Jackson Plan, at 3.

[26]     *See* Deposition of F.S. Jackson, Exhibit 19 to Defendants' Reply, at 229-31.

[27]     Game Plan, Memorandum dated August 16, 2002, Exhibit 14 to Defendants' Reply, at 2.

[28]     *See, e.g.,* TEX. PENAL CODE ANN. § 30.05(a) ("A person commits an offense if he enters or remains on or in property . . . of another without effective consent . . . and he:  (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so.").

**B.**     **Detention Without Reasonable Suspicion**

Plaintiffs argue that the Smith Plan, the Jackson Plan, and/or the City's underlying "zero tolerance policy," violate the Fourth Amendment because they call for the detention and questioning of all persons within a specified containment area, regardless of whether those persons had a legal right to be present on the premises contained.  Plaintiffs claim that the Smith and Jackson Plans and/or the City's "zero tolerance" procedure illegally dispensed with the Fourth Amendment requirement that persons may be "seized" – in this context, temporarily detained for questioning – by police only upon reasonable suspicion.  Plaintiffs claim that the Plans and "zero tolerance" called for the illegal mass detention of all persons at the listed sites.  In response, Defendants argue that the detentions planned for the various street racing initiatives were permissible on the basis of *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  In this Part, the Court examines whether mass, suspicionless containment and questioning violate the Fourth Amendment.

There are three general types of encounters between police and individuals:  First, there is a "consensual encounter," which may be initiated by police without any objective level of suspicion, in which the individual willingly agrees to speak to police.  Without more, a consensual encounter does not amount to a Fourth Amendment "seizure."  *United States v. Cooper,* 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v. Bostick*, 501 U.S. 429, 435 (1991)).  Second, there is a "limited investigative stop," permissible under *Terry v. Ohio* if there is a "reasonable suspicion" that a person has committed or is about to commit a crime.  *Id*.  Third, there is an arrest, which must be based upon probable cause and justifies a

"warrantless full-blown body search." *Id.* In determining whether or not a seizure has occurred for purposes of the Fourth Amendment, the Court must examine, in light of the totality of the circumstances, whether or not a reasonable person would have believed he or she was free to leave or to refuse to consent to the search the officers have requested. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991); *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir.), *cert. denied*, 117 S. Ct. 183 (1996). The test is an objective one that looks to the police officer's conduct at issue and the setting in which it occurs. *Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988). This objective analysis, focusing on the officers and the setting, allows the law enforcement officers to determine in advance whether their contemplated conduct will violate the Fourth Amendment. *Id.* Furthermore, the "reasonable person" test presupposes an *innocent* person. *Bostick*, 501 U.S. at 438.

"[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth] Amendment[], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse,* 440 U.S. 648, 653 (1979). Seizures violate the Fourth Amendment only if they are unreasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (stating that the "touchstone of the Fourth Amendment is reasonableness" (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991))). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Id.* The Supreme Court and Fifth Circuit have long held that "warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Ho*, 94 F.3d 932, 935 (5th Cir. 1996) (citing *United States v. Cardenas*, 9 F.3d

1139, 1147 (5th Cir. 1993)).  In general, any restraint on a person amounting to a Fourth Amendment seizure is invalid unless justified by probable cause.  *See United States v. Odutayo*, 406 F.3d 386, 390-91 (5th Cir. 2005).  However, certain limited investigative stops, or detentions, known as *Terry* stops, are justifiable if there is a "reasonable, articulable suspicion that a person has committed or is about to commit a crime."  *United States v. Chavez,* 281 F.3d 479, 485 (5th Cir. 2002); *see also Terry*, 392 U.S. at 21.  Warrantless searches also are permissible when police receive voluntary consent to search by a person able to give such consent.  *United States v. Solis,* 299 F.3d 420, 436 (5th Cir. 2002).

Defendants correctly urge that an investigative stop pursuant to *Terry v. Ohio* is legitimate if the officer has "reasonable suspicion" that the suspect has committed or is about to commit a crime.  Reasonable suspicion is a standard which is "considerably easier for the Government to establish than probable cause." *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1630 (1994) (citing *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993)).  However, the reasonable suspicion standard renders searches and seizures unreasonable in the absence of *individualized* suspicion of wrongdoing.  *See Chandler v. Miller,* 520 U.S. 305, 308 (1997).  In the context of a *Terry* stop, an officer "must be able to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21 (emphasis added); *accord United States v. Sokolow*, 490 U.S. 1 (1989); *Delaware v. Prouse*, 440 U.S. 648, 653-55 (1979).

It is only in very limited circumstances that the individualized reasonable suspicion requirement does not apply. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 37 (2000) (holding brief suspicionless detention of motorists at drug interdiction checkpoints violates Fourth Amendment). Police may not establish a program of mass detention with the sole and "primary purpose . . . to detect evidence of ordinary criminal wrongdoing." *See id.*; *Collins v. Ainsworth,* 382 F.3d 529, 538 (5th Cir. 2004) (applying *Edmond*); *see also Illinois v. Lidster,* 540 U.S. 419, 423 (2004) (upholding constitutionality of police roadblock where "[t]he stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants . . . for their help in providing information about a [specific significant] crime in all likelihood committed by others"). The Supreme Court has "recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." *Edmond,* 531 U.S. at 41; *see also id.* at 37 (citing *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976) (upholding brief, suspicionless seizures of motorists at fixed border patrol checkpoint designed to intercept illegal aliens); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990) (upholding sobriety checkpoint aimed at removing drunk drivers from road); *Delaware v. Prouse,* 440 U.S. 648 (1979) (suggesting roadblock with purpose of quickly verifying drivers' licenses and vehicle registrations would be permissible)); *Lidster,* 540 U.S. at 423-24 (differentiating between roadblocks justified by generalized interest in screening for a crime and roadblocks justified by police "information-seeking" about a specific, significant prior occurrence); *Collins,* 382 F.3d at 537-38, 543-44 (holding that sheriff's

decision to institute license checkpoints on road leading to rap music concert had impermissible programmatic purpose).  Each of the exceptions to the rule requiring individualized suspicion "was designed primarily to serve purposes closely related to the problems of policing the border, or to the necessity of ensuring roadway safety," *Edmond,* 531 U.S. at 41, or to "information-seeking" from the public, *Lidster,* 540 U.S. at 423-24.  *See also Collins,* 382 F.3d at 538.

Where the primary purpose of a mass detention is a "general interest in crime control," the Supreme Court has articulated a "presumptive rule of unconstitutionality."  *See Lidster,* 540 U.S. at 424, 426.  Where there are "special law enforcement concerns," such as border control or preventing drivers from operating vehicles while intoxicated, suspicionless stops are subject to a reasonableness analysis.  *See id.* at 424, 426-27.  "[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'"  *Id.* at 427 (quoting *Brown v. Texas,* 443 U.S. 47, 51 (1979)).

The Court now turns to the "zero tolerance policy" and the individual plans implementing "zero tolerance" and analyzes whether they violate these principles.  The Court also examines whether Plaintiffs have raised a fact issue regarding approval by Chief Bradford of the individual plans as formal policy.

### C.    Analysis of Formal City Policies

Plaintiffs' first theory is that their civil rights were violated by a formal City policy of "zero tolerance," the Smith Plan, and/or the Jackson Plan.  "Municipal liability under

section 1983 requires proof of three elements:  a policymaker; an official policy; and a

violation of constitutional rights whose "moving force" is the policy or custom." *Pineda v.

City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002); *see also Piotrowski v. City of Houston,*

237 F.3d 567, 578 (5th Cir. 2001).  "Under § 1983, a municipality or local governmental

entity such as an independent school district may be held liable only for acts for which it is

actually responsible." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.,* 153 F.3d 211, 215-16

(5th Cir. 1998) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986); *Spann v.

Tyler Indep. Sch. Dist.,* 876 F.2d 437, 438 (5th Cir. 1989)); *see also Monell v. Dep't of

Social Servs. of New York*, 436 U.S. 658, 694 (1978) (municipality may be held liable under

§ 1983 when "execution of a government's policy or custom, whether made by its lawmakers

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

injury").  A municipality cannot be held liable *solely* because it employs a tortfeasor.  In

other words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

theory.  *Monell,*  436 U.S. at 691.

For a municipality to incur liability under § 1983, its officers' "unconstitutional

conduct must be directly attributable to the municipality through some sort of official action

or imprimatur."  *Piotrowski,* 237 F.3d at 578.  Ordinarily, such an official imprimatur is

contained in duly promulgated policy statements, ordinances or regulations.  *Id.* at 579.

Under *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480-81 (1986), a "decision to adopt a

particular course of action" may "represent[] an act of official government 'policy' as that

term is commonly understood," provided that the action "is directed by those who establish

governmental policy."  "[W]hether a particular official has 'final policymaking authority' is a question of state law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988).  The parties agree that former Chief Bradford was at all pertinent times the individual with relevant policy-making authority for the HPD and thus the City.[29]

Plaintiffs have identified three primary "policies" that they contend were a "moving force" behind the constitutional violations they claim.  Plaintiffs first allege that "zero tolerance" is a formal city policy, and that the City failed to adequately define the "zero tolerance" concept. They also claim, more specifically, that the Smith Plan and the subsequent Jackson Plan represent policies that were a "moving force" behind the constitutional violations they allege.[30]  *See Pineda,* 291 F.3d at 328.  Plaintiffs do not claim that a policymaker reviewed or approved the August 16 Game Plan prior to its execution.

---

[29]   *See* City of Houston Code of Ordinances, Ch. 34 § 34-23 (delegating responsibility for promulgating administrative rules and regulations governing the conduct of police and the police department to the chief of police); *see also Webster v. City of Houston,* 735 F.2d 838, 852-53 (5th Cir. 1984) (Williams, *et al.,* J.J., dissenting) (*en banc*).

[30]   Plaintiffs also claim Rules 1.5, 1.7, and 1.8 of the HPD Rules Manual were a moving force behind their constitutional violations. Rule 1.5 provides that an officer who refuses to follow a lawful order can be disciplined for insubordination. Rule 1.7 states that if an officer receives an order that is contrary to a departmental policy or rule, he must first obey the order to the best of his ability, then appeal the order to the Chief of Police, without going through the chain of command.  Rule 1.8 states that if an officer receives an order he knows to be unlawful, he must refuse to obey the order and report the order to the Chief by going through the chain of command.  Plaintiffs argue that there is a conflict within the structure of the rules that puts police officers to a Hobson's choice when deciding whether to follow questionable orders.  Although Plaintiffs complain of this general structure, they fail to explain how the rules are (1) facially unconstitutional; or (2) inevitably destined to lead to constitutional violations.  Rule 1.5 clearly provides that officers are not to follow unlawful orders.  In any event, these rules were rescinded in 1997.  *See* Memorandum dated June 18, 1997 from C.O. Bradford, Revision of General Order 200-08 and Rescission of General Orders 200-30, 200-37, and Rules 1.2, 1.3, 1.5 through 1.9 and 2.1 through 2.9, Exhibit 22 to Defendants' Reply. Thus, these Rules cannot serve as a basis of municipal liability.

The City and Bradford argue that, even assuming "zero tolerance" were official City policy, Plaintiffs offer no evidence that it is facially unconstitutional.  In regard to the Smith Plan and the Jackson Plan, Defendants also argue that these Plans were not facially unconstitutional.  Finally, Defendants argue that the Jackson Plan was not approved by a City policymaker.  Defendants thus urge the Court to employ the law applicable to facially innocuous policies, arguing that Plaintiffs present no evidence that either "zero tolerance" or the Smith and Jackson Plans were promulgated with deliberate indifference to "known or obvious" unconstitutional consequences, and that therefore municipal liability cannot attach under § 1983.

The Court first examines whether "zero tolerance" or the Smith or Jackson Plans were facially unconstitutional, and whether Plaintiffs have raised fact issues regarding whether these procedures represented official City policy.  After concluding that the Jackson Plan was facially unconstitutional, the Court then turns to the issue of whether the facially constitutional "zero tolerance" policy and the Smith Plan could nevertheless support municipal liability as formal policies.

### 1.    Analysis of Facial Constitutionality of City Policies

An unconstitutional official policy renders a municipality liable under § 1983. *Piotrowski,* 237 F.3d at 579.  If a policy is facially unconstitutional, the policymaker is deemed to have knowledge of the policy and the likelihood that constitutional violations will result from its fulfillment.  *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir. 2003). To establish whether this presumption applies, the Court must determine whether the policy

in question is constitutional "on its face" – that is, by its written terms.  *See, e.g., Monell v. Dep't of Social Servs.,* 436 U.S. 658, 661, 694-95 (1978) (policy of city compelling pregnant employees to take unpaid leaves of absence before such leaves were required by medical necessity violated plaintiffs' constitutional rights and gave rise to cause of action against the city pursuant to § 1983); *Gomillion v. Lightfoot,* 364 U.S. 339 (1960) (Alabama statute excluding 99% of blacks from voting was unconstitutional on its face); *Strauder v. West Virginia,* 100 U.S. 303 (1879) (West Virginia law prohibiting blacks from jury service *per se* unconstitutional).  With this concept in hand, the Court examines whether the City's "zero tolerance" concept, as the term was used by the HPD, or the Smith or Jackson Plans, are facially constitutional.

### a.    "Zero Tolerance" Policy

Plaintiffs urge the Court to examine certain extrinsic evidence in order to determine the facial constitutionality of "zero tolerance" and its intended meaning in the context of the Operation ERACER plans.  Plaintiffs' suggested approach is inappropriate in the facial constitutionality inquiry.  As the Court has noted, in determining the facial constitutionality or unconstitutionality of a policy, the Court may look only at the text of the policy at issue.  There is some evidentiary support for Plaintiffs' allegation that "zero tolerance" is a formal city policy.[31]  However, the evidence supporting Plaintiffs' claim that "zero tolerance" is a

---

[31]    *See* Deposition of Captain John Mokwa, Exhibit 2 to Plaintiffs' Response, at 97 (stating that "zero tolerance is an official policy"); Memorandum dated Oct. 5, 2001 from J.L. Breshears to Patrol Division Commanders (instructing that "zero tolerance" is valuable strategy, but (continued...)

formal City policy does not support Plaintiffs' argument that "zero tolerance" is *facially* unconstitutional.[32]  There appears to be no HPD or other City document that defines the meaning of "zero tolerance."[33]  Contrary to Plaintiffs' assertions,[34] HPD's failure to define "zero tolerance" is not evidence of facial unconstitutionality.  In the absence of such a definition or other written description of the policy, the Court holds that the HPD "zero tolerance" policy is not facially unconstitutional.[35]

### b.    The Smith Plan

There is evidentiary support for Plaintiffs' contention that the Smith Plan comprised "official policy" of the City.  Ample evidence exists to suggest that the Smith Plan was

---

[31]     (...continued)
such operations must be authorized by an officer of rank of captain or higher).

[32]     *See* Memorandum dated Oct. 5, 2001 from Executive Assistant Chief Operations Coordinator J.L. Breshears to Patrol Division Commanders, Zero Tolerance Operations, Exhibit 3 to Plaintiffs' Response.  The memorandum states in relevant part:

> The Houston Police Department believes that "Zero Tolerance" is a valuable strategy when utilized under controlled circumstances.  This letter serves as a reminder to patrol division commanders that Zero Tolerance operations must be authorized by someone of the rank of captain or higher.  You are to limit the use of Zero Tolerance operations to those situations that are most appropriately dealt with by these tactics.
>
> When initiating Zero Tolerance operations, you are instructed to remind your officers to respect the individual rights of citizens and ensure that they are inconvenienced as little as possible.

[33]     *See* Deposition of C.O. Bradford, Exhibit 32 to Plaintiffs' Response, at 132.

[34]     *See* Plaintiffs' Response, at 20.

[35]     But, the "zero tolerance" policy may nevertheless be unconstitutional.  *See infra* Part III.C.2.a; Part III.D; Part III.E.

approved by Bradford himself.[36]  However, contrary to Plaintiffs' assertions, the Smith Plan

did not explicitly call for mass detention absent individualized suspicion.[37]  The Court

concludes that the Smith Plan was plainly not facially unconstitutional, although individual

officers may have violated Plaintiffs' constitutional rights in carrying out the Plan.[38]

### c.  The Jackson Plan

In contrast, the Court concludes that the Jackson Plan included a facially

unconstitutional mass detention component.  There is no *direct* evidence that the Jackson

Plan was approved by Bradford.  Nevertheless, as detailed below, the Court concludes that

Plaintiffs have presented sufficient circumstantial evidence to raise a genuine factual issue

---

[36]  Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98.

[37]  The Smith Plan provided in relevant part:

Operational Plan

The second stage of the operation will consist of examination of all intelligence and evidence gathered during the course of the first stage. Following this examination process, suspects will be identified and criminal charges will be prepared.  Once to-be warrants are in hand, operation personnel will be separated into several arrest teams.  These arrest teams will be supported by uniformed officers assigned to the Westside Patrol Division. Arrest teams will conduct zero tolerance sweeps through any identified street racing sites and/or staging areas.  Officers will strictly enforce all State and Federal laws as well as all local ordinances.  Officers will also execute the before mentioned to-be warrants.  This zero tolerance and arrest process will be conducted during the final two weekends of the operation.

Smith Plan, at 3.

[38]  Although Captain Smith's subsequent evaluation of his street racing initiative (issued prior to Operation ERACER) states that measures involving mass containment and questioning were in fact used, there is no evidence Bradford approved that procedure in advance.  *See* Smith Evaluation, at 3.

regarding whether Bradford personally approved the Jackson Plan.  As a result, the City is

not entitled to summary judgment on Plaintiffs' claim on the basis of the Jackson Plan as a

facially unconstitutional policy.

The Jackson Plan, the blueprint for Operation ERACER, reflected a "general interest

in crime control," with officers detaining everyone and scrutinizing for teen curfew

violations and public consumption of alcohol, as well as scrutinizing drivers' licenses,

insurance, registrations, and vehicle inspection stickers.[39]  The Plan explicitly called for the

same "zero tolerance" strategy of mass detention and scrutiny that had been employed in

practice the Smith Initiative.[40]  The Jackson Plan identified the 8400 and 5700 blocks of

Westheimer as targeted staging/racing locations.  However, the Plan did not include any

requirement that all businesses on the targeted properties be closed to avoid capturing

---

[39]     *See* Jackson Plan, at 3.  The Jackson Plan provided:

> Zero Tolerance will be the strategy utilized to combat this problem.  All exits
> to the area will be blocked and closed by units designated for containment.
> All vehicles within the containment area will be inspected and scrutinized for
> violations.  Each vehicle will be directed toward a specified exit.  As the
> vehicles leave the containment area, they will be divided into groups.  Those
> identified as 'racers' will be arrested for the violations committed and the
> vehicles will be inventoried and towed to a certified storage lot.  Those
> vehicles containing juveniles or persons found to be consuming alcoholic
> beverages will be addressed in the same manner.  Those believed to be
> spectators should be directed toward the exit of a parking lot.  Once they are
> on the street, the drivers may be checked for driver's license and insurance.
> The vehicles may be checked for registration and inspection sticker.  Citations
> will be issued for all violations discovered during the course of the operation.

*Id.*

[40]     *See* Smith Evaluation, at 3.

legitimate customers in the sweep.[41]  Moreover, the Jackson Plan did not require any officers

to see street racing taking place on the August nights of the arrests or target vehicles that had

been seen racing in June through the Smith Initiative surveillance.  Nor did the Plan even

require officers to wait until they observed meaningful preparations for street racing.  Rather,

the Plan provided that "[a]ll exits to the area will be blocked and closed by units designated

for containment," and that "[a]ll vehicles within the containment area will be inspected and

scrutinized for violations."[42]  Because the mass detention had the primary purpose of

detecting ordinary crime, it is *per se* unconstitutional under *Edmond*.

Defendants retort that *Edmond* is distinguishable because HPD was acting pursuant

to a specialized task of controlling street racers, a "purpose[] closely related to . . . the

necessity of ensuring roadway safety," and not a generalized goal of controlling crime.  *See*

*Edmond,* 531 U.S. at 42.  While it is true that the Jackson Plan had a specific task of

combating street racing and its associated ills, this type of criminal activity does not fit the

narrow circumstances defined by the Supreme Court (*i.e.,* border control, driver sobriety,

information-seeking to solve a significant crime) under which law enforcement agents are

not constrained by the requirement of individualized suspicion.  *See id.*; *Lidster*, 540 U.S.

at 423-24.  Unlike driver intoxication, it is perfectly apparent without stopping a car whether

---

[41]     There is evidence that the planners knew or should have known that businesses were open at
those locations during the times the Plan was to be implemented.  *See* Smith Plan, at 3;
Jackson Plan, at 3 (listing 5700 and 8400 blocks of Westheimer Road – the locations of James
Coney Island, K-Mart, and Sonic – as targeted sites); Game Plan, at 1 (describing how
officers were to deal with detained "legitimate patrons of the open businesses").

[42]     Jackson Plan, at 3.

the car is engaged in street racing.  Moreover, in *Edmond,* the Supreme Court held that even drug interdiction checkpoints, aimed at catching narcotics violations, were impermissible because they served a "general interest in crime control," and distinguished the narcotics checkpoints from programs aimed at "ensuring roadway safety."  *See id.*  In light of *Edmond,* Jackson's plan to detain all persons within the containment area, with no regard for the existence of open businesses and their customers, is facially unconstitutional.[43]

Although the Jackson Plan is subject to *Edmond's* presumptive rule, the Court nevertheless conducts a *Brown* reasonableness analysis and concludes that the Plan fails this test as well.  *See Lidster,* 540 U.S. at 424, 426 (stating that where "special law enforcement concerns" exist, suspicionless stops are subject to a reasonableness analysis under *Brown v. Texas,* 443 U.S. at 51).  "[I]n judging reasonableness, we look to 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'"  *Id.* at 427 (quoting *Brown,* 443 U.S. at 51).

Street racing is not a problem that falls within the Supreme Court's narrow exceptions to the rule against suspicionless stops.  Even if racing were so significant a problem, the manner in which the way the Jackson Plan addressed the problem is unjustifiable under the Fourth Amendment.  Undoubtedly, street racing presents a serious public concern.  However, it is not a crime in Texas or Houston to – deliberately or accidentally – witness a street race.

---

[43]     The Court does not hold that detentions or arrests of actual street racers would be unconstitutional.

Plans to detain everyone to screen for various crimes do little to advance the public interest in curbing street racing.  The best way to stop street racing would be repeatedly to target the racers themselves.  Finally, and most importantly, the Jackson Plan's interference with individual liberty was extremely severe.  The Plan called for everyone to be trapped in the parking lots of eleven locations – some of which contained businesses open twenty-four hours a day – with all vehicles "inspected and scrutinized for violations."  It called for officers to "document each and every person they have encountered."  The detentions in the Jackson Plan were vastly different from a brief sobriety or immigration checkpoint.  The Jackson Plan contemplated lengthy detention and invasive searches.  It reflected an unjustified, almost totalitarian, "regime of suspicionless stops," *Edmond*, 531 U.S. at 41, and was completely inconsistent with the Fourth Amendment rights Americans hold dear.

Defendants argue that, even without individualized reasonable suspicion, the planned detentions were constitutional because the standard for the detentions was neutral and articulable – detain everyone.  *See Prouse,* 440 U.S. at 663.  In *Prouse,* the Court held that discretionary, suspicionless stops of automobiles for the purpose of verifying license and registration were unconstitutional, but suggested in *dicta* that questioning every car, as opposed to randomly selected cars, in the oncoming traffic would not be unconstitutional. *See id*.  This argument is rejected on the facts at bar.  The mere fact that the Plan called for *everyone* found in shopping centers' parking lots to be subjected to search and seizure does not in any way avoid the constitutional infirmity to salvage the Jackson Plan.  Defendants' contention that mass suspicionless searches – no matter the severity of the interference with

individual liberty – are permissible so long as everyone is treated equally unjustly is unsupported in law and entirely unpersuasive.

Defendants also argue that the planned investigative detentions were "temporary and last[ed] no longer than . . . necessary to effectuate the purpose of the stop," as required by *Florida v. Royer,* 460 U.S. 491, 500 (1983). The Court again remains unpersuaded. The Jackson Plan did not specify a time limit to complete the investigative detentions, but the record indicates that some people were detained for as long as two hours during the execution of the prior Smith Initiative, and much longer the nights Operation ERACER was implemented. In *Royer,* the plaintiff was detained for approximately fifteen minutes and was arrested as a result of the stop. *Id.* at 495. The *Royer* Court found that the stop unconstitutional, in part because the Court found the detention more intrusive than necessary. *Id.* at 504; *see also Lidster,* 540 U.S. at 422 (upholding stops of ten-to-fifteen seconds); ; *Sitz,* 496 U.S. at 448 (upholding delays of 25 seconds); *Martinez-Fuerte,* 428 U.S. at 547 (upholding stops of three-to-five minutes). Detaining for hours all persons found in a parking lot under the circumstances presented simply because they were in the lot when police arrived is not reasonable under the Fourth Amendment.

Defendants also argue that the Jackson Plan was not suspicionless because it called for establishment of reasonable suspicion through a surveillance component. This argument is unavailing. First, it ignores a crucial component of the Plan. The Jackson Plan called for confinement of *all* persons at the sites listed, not confinement of only the specific persons observed or even suspected to have violated laws. Second, the surveillance on which the

Plan apparently relied was from two months earlier, with no provision that the offenders in June would be the ones arrested or detained in August.  The Supreme Court has held that detaining officers must establish a "particularized and objective basis" for the reasonable suspicion of wrongdoing for each individual detainee.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417 (1989)).  Defendants point out that detention is constitutional when police establish reasonable suspicion that criminal activity may be in progress based on their observation of unusual conduct, and when the officers are able to identify specific facts that justify their suspicion.  *Terry,* 392 U.S. at 30-31.  Defendants assert that officers may use their special training and familiarity with the area and its citizens, and under the totality of circumstances assess the required "reasonable suspicion" needed for a constitutional detention.  *See Arvizu*, 534 U.S. at 275.

Defendants argue that the plans at issue were based upon the requisite reasonable suspicion because HPD acquired knowledge about street racing activities at the selected sites through the use of undercover surveillance officers in the weeks prior to the events here at issue.  Defendants argue that, through covert surveillance, HPD officers observed conduct that gave rise to reasonable suspicion that criminal activity was taking place, and were able to identify specific facts that justified that suspicion.  *See Terry*, 392 U.S. at 30-31.  Thus, Defendants argue, the planned detentions were not suspicionless and did not violate Plaintiffs' constitutional rights.  *See Edmond*, 531 U.S. at 39-41.  The Court is not persuaded.

The City does not detail the results of the surveillance on which it relies.  However, there is no evidence that, at Operation ERACER's planning stage in July 2002, the

surveillance from evenings in June gave rise to individualized reasonable suspicion regarding the *specific* persons who eventually were detained at HPD's targeted sites in August.  The time frame between the surveillance and arrests was least weeks, if not months.  There is no evidence HPD knew which specific individuals would be present on August 16-18, let alone who would commit a crime or be poised to do so in August.  Nevertheless, the Jackson Plan explicitly called for a cone pattern traffic flow, which ensured that every car who happened to be in a targeted parking lot would be forced through a specified exit, where HPD officers would stop and investigate each vehicle and its occupants.[44]  The requirement for the confinement of all persons is inconsistent with Defendants' contention that the Plan required reasonable, individualized suspicion.[45]

Aside from relying on the Jackson Plan as written, Defendants argue that reasonable suspicion was in fact established on the scene on the nights in question.  Defendants argue that reasonable suspicion arose for the events in question because Plaintiffs were part of a large crowd gathered at 12:00 a.m. on private property with loud music playing and smoke in the air.  Defendants do not identify for the Court any evidence to establish that Plaintiffs in this case were part of an illegally gathered – or even suspicious – crowd.  Plaintiffs, on the other hand, offer evidence that they were legitimate customers present at open businesses.  Reasonable suspicion must be based on something more than a vague or

---

[44]     *See* Jackson Plan, *passim.*

[45]     *See id.*

generalized hunch.  It is not enough for a subject of suspicion to be, for example, merely present in a location known for a high incidence of crime.  *See Brown v. Texas*, 443 U.S. 47, 51-52 (1979).  Plaintiffs have shown a genuine fact issue exists regarding whether officers had any particularized suspicion of Plaintiffs in the instant case on the evenings in question, and whether any such suspicion was reasonable.[46]

Furthermore, there exists a genuine issue of material fact regarding whether Bradford approved the Jackson Plan. Such an approval would render the Jackson Plan an "official policy" of the City.  There is evidence that suggests he did approve the Jackson Plan, at least in its essence.  Bradford approved the Smith Plan, and stated that it would be the model plan[47]; Bradford delegated authority to Breshears to address the street racing problem[48]; Breshears kept Bradford generally apprised of what was going on with regular weekly meetings, in addition to phone calls and daily meetings as needed[49]; McClelland told

---

[46]     Defendants also contend that Plaintiffs' arguments regarding unlawful detention should be ignored because Plaintiffs urge the wrong standard.  It is true that Plaintiffs, after setting forth the correct rule of *Edmond*, go on to urge that City plans included detention without "probable cause," and the proper standard for a *Terry* stop is "reasonable suspicion."  Plaintiffs' error is immaterial because the Jackson Plan called for detention without individualized suspicion, which is unreasonable except under limited circumstances.

[47]     Deposition of C.O. Bradford, Exhibit 49 to Plaintiffs' Response, at 97-98; Deposition of C.O. Bradford, Exhibit 60 to Plaintiffs' Response, at 35-36, 39, 98.

[48]     Deposition of C.O. Bradford, Exhibit 59 to Plaintiffs' Response, at 26-27, 97; Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[49]     Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

Bradford and Breshears that he was going to run a street racing initiative[50]; McClelland was, at a minimum, required to obtain approval from Breshears to implement any such plan[51]; McClelland gave approval to Aguirre to devise a plan to address street racing, which responsibility Aguirre delegated to Jackson, who drafted the Jackson Plan[52]; and, according to Aguirre, McClelland told him that Bradford knew of Aguirre's plan to conduct Operation ERACER, and that Bradford removed the traffic detail component from the operation, something Bradford could not have done if he were unaware of the Plan.[53]  In addition, the Jackson Plan called for extensive resources, which is further circumstantial evidence that Chief Bradford would have been involved with the Plan.[54]  Given Aguirre's testimony, the close virtually daily contact between Bradford and Breshears, together with the requirement that McClelland obtain approval from Breshears, and resolving all doubts in favor of Plaintiffs, a jury would be permitted to draw from this circumstantial evidence a reasonable inference that Bradford knew and approved of the Jackson Plan.  Furthermore, given that the Jackson Plan called for the detention of all persons found in targeted locations and that

---

[50]     Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127; Deposition of C.O. Bradford, Exhibit 61 to Plaintiffs' Response, at 44.

[51]     Deposition of C.O. Bradford, Exhibit 62 to Plaintiffs' Response, at 45-46.

[52]     Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70; Deposition of F.S. Jackson, Exhibit 44 to Plaintiffs' Response, at 19-20.

[53]     Deposition of M.A. Aguirre, Exhibit 58 to Plaintiffs' Response, at 280.

[54]     See Jackson Plan, at 4 (calling for use of 55 officers and commanders).

Plaintiffs were in fact detained, there is obviously a fact issue regarding whether the Plan was a moving force behind the violation of Plaintiffs' constitutional rights. Thus, Plaintiffs have raised genuine fact issues that defeat the City's summary judgment motion to the extent Plaintiffs claim that the Jackson Plan was a formal City policy.

> ### 2.     Analysis of Constitutionality of Facially Innocuous City Policies

Because it is by no means certain that Plaintiffs will be able to establish at trial that the facially unconstitutional Jackson Plan was approved by Bradford and thus was official City policy, the Court will also address the parties' remaining arguments regarding the facially innocuous "zero tolerance" policy and Smith Plan. Defendants argue there is insufficient evidence to support Plaintiffs' claim that "zero tolerance," as the term is intended by the City's official policy, calls for City police officers to perform unconstitutional actions. Defendants also argue that there is insufficient evidence to support a claim that the Smith Plan called for such unconstitutional actions.

A facially innocuous policy may support liability only if "promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski,* 237 F.3d at 579 (quoting *Brown,* 520 U.S. at 403) ("Deliberate indifference . . . is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability."). A heightened standard of proof applies to Plaintiffs' claims regarding a facially innocuous policy. *See, e.g., Victoria W. v. Larpenter,* 369 F.3d 475, 482 (5th Cir. 2004) (quoting *Brown,* 520 U.S. at 405) ("[W]hen the claim is that while a municipal policy itself did not violate federal law, it caused another

actor to inflict the injury, 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'").

### a.    "Zero Tolerance" Policy

There is no evidence in the record regarding just what "zero tolerance" was understood to mean at the time the "zero tolerance policy" was promulgated.  There is no document that defines the meaning of "zero tolerance" within the City of Houston.[55]  Nor is there evidence or a suggestion that, at the time the "zero tolerance policy" was *promulgated*, "zero tolerance" would obviously result in, let alone was known to result in, constitutional violations.  "Zero tolerance" therefore cannot support City liability as a formal policy.

### b.    The Smith Plan

To the extent the Smith Plan is deemed a formal City policy, there is no evidence that unconstitutional consequences were known or obvious at the time of its promulgation.  The Smith Plan provided for three weeks of covert actions, specifically surveillance to establish probable cause, as well as for the obtaining of arrest warrants, before the overt phases of the operation.  The Smith Plan included no suggestion of mass detentions of spectators or otherwise.[56]  In any event, the Smith Plan, as a formal policy, has not been shown to be the causal moving force behind Plaintiffs' injuries because there is no evidence that it was used in Aguirre's Operation ERACER on the weekend of August 16-18, 2002.  *See Piotrowski,*

---

[55]    Deposition of C.O. Bradford, Exhibit 32 to Plaintiffs' Response, at 132.

[56]    *See generally* Smith Plan.

237 F.3d at 580 ("There must be a direct causal link between the municipal policy and the constitutional deprivation."); *see also Larpenter,* 369 F.3d at 482 (requiring "rigorous standards of culpability and causation"). Although the Smith Plan may eventually have formed a basis for Operation ERACER, the Smith Plan was promulgated for use in the Smith Initiative, with overt operations initially set for the weekends of June 21 and June 28, 2002.[57] The Smith Plan set forth a time-limited initiative and cannot, by itself, result in City liability for events transpiring at a subsequent initiative.[58] Because "zero tolerance" and the Smith Plan as formal City policies do not result in legally cognizable claims, the Court next analyzes whether the second approach under *Monell*, 436 U.S. at 694, HPD's customary use of "zero tolerance," could support municipal liability.[59]

### D.    Analysis of Informal City Policy:  Evidence of Recurring Pattern to Show a Custom or Practice

Even if a policy is not formally approved by a City policymaker, municipal liability may result from "[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002). Without proof of a recurring pattern, a claim

---

[57]    *See id.* at 2; *see also* Smith Evaluation.

[58]    The Court considers below the issue of whether the Smith Plan, as written and executed, supports liability as evidence of HPD custom.

[59]    The Court does not analyze the Jackson Plan as a facially innocuous policy because it concluded that the Jackson Plan is facially unconstitutional in *supra* Part III.C.1.c.

based upon a customary policy must fail.  *See Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001) ("A customary municipal policy cannot ordinarily be inferred from single constitutional violations.")   "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."  *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984).  For liability to attach on this basis, actual or constructive knowledge of the custom must be attributable to the governing body of the municipality or to an official with policy-making authority.  *Pineda,* 291 F.3d at 328.  Plaintiffs in their Fourth Amended Complaint claim that the "zero tolerance policy," within HPD at the relevant time, was customarily understood to mean "arrest without probable cause."  In their Response to Defendants' Motion, Plaintiffs also argue that "zero tolerance," in practice, was also understood to mean "detain without reasonable suspicion."  The Court addresses these claims in turn.[60]

### 1.    Arrest Without Probable Cause

Plaintiffs argue that by HPD custom, "zero tolerance"[61] encompassed the arrest of persons in the absence of probable cause.  If proven, such a customary policy or practice

---

[60]     Plaintiffs attempt to raise a fact issue concerning whether Aguirre and Bradford viewed "zero tolerance" to mean mandatory incarceration for violators or a combination of incarceration and citations.  *See* Plaintiffs' Response, at 10-13, 20 (citing *Fields v. City of South Houston,* 922 F.2d 1183 (5th Cir. 1991)).  Because it is constitutional to arrest, with probable cause, those suspected of committing misdemeanors, *see Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001), this issue is irrelevant.

[61]     Plaintiffs here point collectively to Operation ERACER (as implemented and as evidenced by the Game Plan), as well as the Jackson Plan, the written basis for that operation, as the most recent illustration of the informal "zero tolerance" policy.

could result in municipal liability under § 1983. "[A]n arrest . . . constitutes a seizure under the Fourth Amendment" and must be accompanied by probable cause. *U.S. v. Williams,* 365 F.3d 399, 403-04, (5th Cir. 2004). It is unconstitutional to engage in mass arrests without probable cause as to each individual. *See, e.g., Maryland v. Pringle,* 540 U.S. 366 (2003) (a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause"); *Barham v. Ramsey,* 338 F. Supp. 2d 48 (D.D.C. 2004) (in absence of dispersal order to group gathered in park, police official's belief that some in group had broken laws did not provide probable cause for mass arrest of entire group, such that official was not entitled to qualified immunity under § 1983); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968).

Defendants argue that Plaintiffs have no evidence of a custom of eliminating probable cause for mass arrests pursuant to a "zero tolerance policy." Plaintiffs attempt to counter this contention by pointing to several prior alleged "zero tolerance" operations by HPD.[62] The Court concludes that there is no proof of a pattern or series of incidents demonstrating that HPD has a custom or policy to arrest without probable cause. Plaintiffs assert that the City had a custom of arresting individuals without probable cause at "zero tolerance" operations such as the "Gulfton Ghetto Project," the "Stella Link/Death Valley" initiative, and

---

[62]   Defendants contend that Plaintiffs rely on opinions of Steven D. Ashley, their proffered law enforcement expert, to support Plaintiffs' positions. However, in fact, Plaintiffs only rely in their summary judgment briefing on Ashley in connection with their "negligent supervision" (*i.e.,* failure to supervise) claims, which are addressed in Part III.F.

"Operation: Renaissance."[63]  Plaintiffs point to testimony of "hundreds of arrests,"[64] but do not identify for the Court any evidence regarding the purpose and procedures involved in any of these initiatives, the practices by HPD officers regarding probable cause during these operations, nor the circumstances of the arrests.  Nor do Plaintiffs present evidence of citizen or business complaints regarding these operations, complaints to HPD's Internal Affairs Division ("IAD") or IAD investigations regarding these operations, large numbers of dismissed charges associated with these operations, or warnings from municipal attorneys advising HPD or any of its officers that illegal arrests had been effected.  Plaintiffs thus have presented no evidence of a pattern of mass arrests without probable cause pursuant to a "zero tolerance policy."

Defendants further highlight the weakness of Plaintiffs' position by citing to uncontradicted testimony of numerous police officials and officers who claim HPD has never had a custom, practice, or policy of arrests without probable cause.[65]  Aguirre has testified

---

[63]     Deposition of M.A. Aguirre, Exhibit 73 to Plaintiffs' Response, at 273-74.

[64]     Deposition of M.A. Aguirre, Exhibit 21 to Plaintiffs' Response, at 274-75 (quoted *infra* at 46-47).

[65]     *See* Deposition of C.O. Bradford, Exhibit 4 to Defendants' Motion, at 12-16; Deposition of J.L. Breshears, Exhibit 11 to Defendants' Motion, at 5-8 (Executive Assistant Chief of Police); Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 20-25; Deposition of F.S. Jackson, Exhibit 9 to Defendants' Motion, at 7-19 (lieutenant responsible for planning Operation ERACER).  In addition, other significant evidence indicates that "zero tolerance" has never been understood to include arrest without probable cause. *See* Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 202, 333-34 (stating that "zero tolerance" does not entail making arrests without probable cause); *id* at 197 (testifying he is aware of no custom, practice or policy of condoning arrests without probable cause); other testimony
(continued...)

that probable cause was not suspended for Gulfton, Renaissance, or Death Valley, and that "zero tolerance" does not require the elimination of probable cause.[66]  Thus, Plaintiffs fail to meet their summary judgment burden with evidence of any pattern or series of incidents indicating that the City through HPD had a custom or practice of arresting individual without probable cause during "zero tolerance" operations.  Plaintiffs' claims against the City for a policy, practice or custom of arrests without probable cause are therefore dismissed.

### 2.    Detention Without Reasonable Suspicion

Plaintiffs rely on the informal HPD "zero tolerance" policy for their Fourth Amendment claim against the City concerning their unlawful detentions.[67]  As the Court has articulated above in this Part, municipal liability may result from "[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Pineda,* 291 F.3d at 328.  For liability to attach on this basis, "[a]ctual or constructive knowledge of [the] custom must be attributable to the governing body of the municipality or to an official [with] policy-making authority."  *Id.* (citing *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*)).

---

[65]    (...continued)
cited in Defendants' Motion, at 15-16.

[66]    Deposition of M.A. Aguirre, Exhibit 4 to Defendants' Reply, at 333-34.

[67]    As evidence of this informal policy, Plaintiffs rely on the Smith Initiative and earlier "zero tolerance" operations, as well as the fact that Operation ERACER took place over three different nights.

Plaintiffs argue in their Response to Defendants' Motion that "zero tolerance" was not defined within HPD, but was understood to include detention without reasonable suspicion, a Fourth Amendment violation. Plaintiffs present documentary and deposition evidence, which they argue raises fact issues regarding: (1) a pattern of detention without reasonable suspicion pursuant to "zero tolerance" operations; and (2) Bradford's (and thus, the City's) actual or constructive knowledge of this practice.

Plaintiffs' evidence includes the testimony of Lieutenant F.S. Jackson (author of the Jackson Plan) and Aguirre, as well as the written Smith Evaluation and the Jackson Plan. Jackson testified in deposition regarding "zero tolerance":

> Q:    [Y]ou've testified earlier that your definition of Zero Tolerance included the concept of detaining, if you will, everyone to determine if there's a violation of law and it included writing citations as to – opposed to just pure arrest everyone, correct?

> A:    Yes, sir. Basically my definition of Zero Tolerance was that everyone was subject to scrutiny. If they were found in violation of the law, that they would be either arrested or issued a citation; and that if they were not in violation, then they would – they would be released.[68]

This "zero tolerance" practice of "scrutiny" of "everyone" via temporary detention is supported by the testimony of Aguirre, who participated in "the three largest zero tolerance programs" in HPD history – the "Gulfton Ghetto Project," the "Stella Link/Death Valley" initiative, and "Operation: Renaissance."[69]  Aguirre testified in deposition:

---

[68]    Deposition of F.S. Jackson, Exhibit 20 to Plaintiffs' Response, at 163-64.

[69]    Deposition of M.A. Aguirre, Exhibit 73 to Plaintiffs' Response, at 273-74. As noted above, the evidence submitted by the parties does not indicate what these initiatives involved.

Q:      [B]y definition does zero tolerance mean that there will be differentiation from the standard everyday policies of the Houston Police Department?

A:      Yes, absolutely.

Q:      Now, in the Stella Link zero tolerance operation, were there arrests?

A:      Hundreds.

Q:      And was there approved deviation from the everyday policies and procedures of the City of Houston?

A:      Very much so.  *We erected wooden horses across Stella Link Avenue and all the side streets where people had to sign in.  It was a gulag type situation where you had to sign in and sign people out and everyone else within the contained perimeter was subjected to zero tolerance enforcement techniques.*

Q:      And what about the Gulfton project, were there arrests in that project?

A:      Hundreds of arrests, hundreds.

Q:      And was there deviation from the everyday policies and procedures in the City of Houston because it was a zero tolerance project?

A:      Yes.

Q:      And in the Renaissance zero tolerance project, were there arrests?

A:      Thousands upon thousands upon thousands.[70]

Although Aguirre admits that probable cause was not suspended for the prior "zero tolerance" operations in which he had participated,[71] his testimony indicates that in HPD

---

[70]      Deposition of M.A. Aguirre, Exhibit 21 to Plaintiffs' Response, at 274-75 (emphasis added).

[71]      *See* Deposition of M.A. Aguirre, Exhibit 4 to Defendants' Reply, at 333-34.

parlance, the policy of "zero tolerance" was understood to mean the cordoning off of a specific area, containment of all persons within, and the subjecting of all persons present to "scrutiny" and thus detention to determine who was in violation of a law.

Plaintiffs' evidence also suggests that, in accordance with this understanding, the Smith Plan called for use of "zero tolerance sweeps through any identified street racing sites and/or staging areas."[72]  After the Smith Initiative was complete, in July 2002, Smith described in his evaluation that police vehicles had been used to "effectively block all exits" for an "excess of three hundred and fifty vehicles" and their occupants, that at the scene, a "single exit, manned by both uniformed and plainclothes officers was created," and that all persons at the scene were effectively detained, "[t]he occupants of each vehicle were interviewed within a period of less than two hours, and the scene was cleared."[73]  Thus, Plaintiffs' evidence indicates that "zero tolerance" in the weeks leading up to Operation ERACER was understood to include the mass detention and questioning of, potentially, hundreds of persons, without regard to whether there was reasonable suspicion or probable cause to believe they were violating any laws at the time of their detention.  This problem was exacerbated, Plaintiffs argue, by the lack of a written definition for "zero tolerance."

As this Court has previously concluded, the specific blueprint for Operation ERACER, the Jackson Plan, called for the same "zero tolerance" strategy of mass detention

---

[72]     Smith Plan.

[73]     Smith Evaluation.

46

and scrutiny that had transpired in the Smith Initiative.[74]  The Jackson Plan provided that "[a]ll exits to the area will be blocked and closed by units designated for containment," and that "[a]ll vehicles within the containment area will be inspected and scrutinized for violations."[75]  The Plan did not require that all the businesses using the parking lots in issue be closed, or otherwise direct officers to distinguish between customers of open businesses and others.[76]  The sites listed in the Jackson Plan included establishments that Bradford and his designated policymakers allegedly knew or should have known were open for business at the time of the operation, resulting in the likely detention of legitimate customers who were not in violation of any laws.[77]

Challenging the quality and quantity of Plaintiffs' evidence regarding an illegal custom, Defendants assert that Plaintiffs must demonstrate "[s]ufficiently numerous prior incidents of police misconduct" in order "to prove a custom *and accession to that custom by the municipality's policymakers*.  Isolated instances . . . are inadequate to prove knowledge and acquiescence by a policymaker."  *See McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir. 1989) (emphasis added).  Defendants assert that the Jackson and Aguirre

---

[74]   *See supra* Part III.C.1.c.

[75]   Jackson Plan, at 3.

[76]   *See id.*

[77]   Interestingly, the IAD Summary states that on April 18, 2002, Bradford praised Aguirre's oral proposal that HPD deal with street racing by "implementing Zero Tolerance tactics, mass arrests, and towing vehicles."  Investigation Summary, Exhibit 5 to Plaintiffs' Response, at 208.  Arguably, this bolsters Plaintiffs' claim that the concept of mass detentions was subsumed within the "zero tolerance" procedures that Bradford approved of.

quotes upon which Plaintiffs rely were "taken out of context" and "inadequately developed" by the examiners.  They also argue that there is no evidence that wooden horses were used for containment at the Gulfton or Renaissance initiatives.   Although wooden horses were apparently used at Stella Link, Defendants argue that operation should be ignored because it took place in June 1989.  These challenges to the "quality" of Plaintiffs' evidence create factual disputes the Court cannot decide on summary judgment.

Defendants also attack the quantity of Plaintiffs' evidence, arguing that Plaintiffs cannot meet their summary judgment burden because they have no evidence of:  prior community complaints concerning unlawful mass detentions; IAD complaints; inordinate dismissals by prosecutors of charges filed; communications from government prosecutors warning of the unconstitutionality of "contain and scrutinize" detention; "lax discipline"; or prolonged public discussion of abuse or a high degree of publicity concerning unlawful mass detentions.  In addition, Defendants point out that Plaintiffs present no expert opinion on their detention claim.  In support of their arguments regarding the types of evidence Plaintiffs should have presented, Defendants cite *Pineda,* 291 F.3d at 330, *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1986), and *Zuchel v. City and Cty. of Denver,* 997 F.2d 730, 740-41 (10th Cir. 1993).  These cases are materially distinguishable.

*Pineda*'s suggestion that public discussion or publicity regarding constitutional violations could demonstrate constructive knowledge are listed by way of example and not limitation.  *Pineda* states that "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised

its responsibilities as, *for example,* where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity." *Pineda*, 291 F.3d at 330 (emphasis added).   Indeed, the *Pineda* court confirmed that "[c]onstructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Id.* n.15 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)).   The *Grandstaff* court held that "subsequent acceptance of dangerous recklessness by [a] policymaker tends to prove his preexisting disposition and policy," but it did not hold that such ratification is the only means of proving such a policy. *Grandstaff,* 767 F.2d at 171.   Rather, in the context of the facts of that case, the municipal police chief's failure to react to a single incident of gross police misconduct "sa[id] more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force." *See id. Zuchel* held that evidence that the city failed to implement certain recommendations for police training, as suggested by the district attorney, was sufficient to support a jury's finding of a policymaker's deliberate indifference to the plaintiff's constitutional rights. *Zuchel,* 997 F.2d at 740-41. *Zuchel* did not hold that a municipality may be liable under § 1983 *only* if it ignores such recommendations.

Although the types of evidence urged by Defendants in this case would certainly assist Plaintiffs, the Court concludes that Plaintiffs have met their summary judgment burden to produce evidentiary support sufficient to raise a genuine fact issue that the City through its

policymaker Bradford had actual or constructive knowledge of plans to detain persons without individualized suspicion, pursuant to a "zero tolerance policy."   The evidence indicates that, prior to Operation ERACER, "contain and scrutinize" detention was used on at least two occasions in connection with "zero tolerance" operations, the Stella Link Initiative and the Smith Initiative.[78]  Furthermore, Plaintiffs can point to similar incidents of wrongful detention three nights in a row on August 16, 17, and 18.   The evidence also indicates Bradford himself approved the use of "zero tolerance" for street racing initiatives earlier in the summer of 2002.[79]  As the Court has observed above,[80] there is also evidence that Bradford delegated authority to Breshears to address the street racing problem[81]; Breshears kept Bradford generally apprised of what was going on with regular weekly meetings, in addition to phone calls and daily meetings as needed[82]; McClelland told

---

[78]  The record is unclear if the "contain and scrutinize" approach was used in the other operations on which Plaintiffs rely, and thus the Court does not rely on those operations. Interestingly, however, that Defendants do not submit evidence that mass detentions did not occur.

[79]  Deposition of C.O. Bradford, Exhibit 1 to Plaintiffs' Response, at 97-98 (testifying that as long as ERACER plans complied with the Smith Plan, which he had approved, there was no need to obtain further approval); Deposition of M.A. Aguirre, Exhibit 3 to Defendants' Motion, at 34-49 (testifying that Bradford was aware of and supported Aguirre's Operation ERACER plan).

[80]  *See supra* Part III.C.1.c.

[81]  Deposition of C.O. Bradford, Exhibit 59 to Plaintiffs' Response, at 26-27, 97; Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

[82]  Deposition of J.L. Breshears, Exhibit 63 to Plaintiffs' Response, at 137.

Bradford and Breshears that he was going to run a street racing initiative[83]; McClelland was, at a minimum, required to obtain approval from Breshears to implement any such plan[84]; McClelland gave approval to Aguirre to devise a plan to address street racing, which responsibility Aguirre delegated to Jackson, who drafted the Jackson Plan[85]; and, according to Aguirre, McClelland said that Bradford knew of Aguirre's plan to conduct Operation ERACER, and that Bradford removed the traffic detail component from the operation – which was originally to perform the containment function – something Bradford could not have done if he were unaware of the Plan.[86]   In addition, the Jackson Plan called for extensive resources, which is further circumstantial evidence that Chief Bradford would have been aware of the Plan.[87]   Given Aguirre's testimony, the close, virtually daily contact between Bradford and Breshears, together with the requirement that McClelland obtain approval from Breshears, and resolving all doubts in favor of Plaintiffs, a jury would be permitted to draw a reasonable inference that Bradford was aware of the planned Operation

---

[83]     Deposition of C.A. McClelland, Exhibit 70 to Plaintiffs' Response, at 125, 127; Deposition of C.O. Bradford, Exhibit 61 to Plaintiffs' Response, at 44.

[84]     Deposition of C.O. Bradford, Exhibit 62 to Plaintiffs' Response, at 45-46.

[85]     Deposition of C.A. McClelland, Exhibit 41 to Plaintiffs' Response, at 120; Deposition of M.A. Aguirre, Exhibit 42 to Plaintiffs' Response, at 70; Deposition of F.S. Jackson, Exhibit 44 to Plaintiffs' Response, at 19-20.   Plaintiffs also argue that McClelland stated that HPD policy regarding misdemeanor arrests was being suspended for Operation ERACER, and that McClelland would not have made this statement unless Bradford had approved of the Jackson Plan.   *See* Plaintiffs' Response, at 31. Contrary to Plaintiffs' assertions, Plaintiffs' Exhibit 72 does not support this proposition.

[86]     Deposition of M.A. Aguirre, Exhibit 58 to Plaintiffs' Response, at 280.

[87]     *See* Jackson Plan, at 4 (calling for use of 55 officers and commanders).

ERACER, approved of the use of "zero tolerance" for operation ERACER, and knew or should have known that such tactics might include a "contain and scrutinize" component.

The Court concludes that, taken as a whole, Plaintiffs' evidence raises a material fact issue regarding whether "zero tolerance" was understood within HPD to encompass the detention of large groups of individuals without individual suspicion, and merely to determine whether any individuals were violating any laws.[88]  There also is a fact issue of whether, if the City's "zero tolerance" policy encompassed mass detentions, such policy was the moving force behind Plaintiffs' detentions.  Plaintiffs have thus raised genuine fact issues that defeat the City's summary judgment motion, to the extent Plaintiffs claim that "zero tolerance" was understood by policymakers to encompass "contain and scrutinize" detention.

### E.    Municipal Liability Based on Single Incident of Arrests Without Probable Cause

Implicitly acknowledging they cannot prove a custom or pattern of arrests without probable cause, Plaintiffs seek to recover on their unlawful arrests through heavy reliance on the "single incident exception" set forth in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986).  The Supreme Court held in *Pembaur* that liability under § 1983 could arise out of isolated decisions or actions taken by municipal policymakers.  *See id.; see also Milam v. City of San Antonio,* 113 Fed. Appx. 622, 626 (5th Cir. 2004) ("[P]laintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers

---

[88]    The Jackson Plan and Operation ERACER (as set forth in the Game Plan and as implemented) illustrate the "zero tolerance" policy, and suffered from the deficiency described in this section.

themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions."); *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 406 (1997) (quoting *Pembaur,* 475 U.S. at 481) ("A final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983."); *cf. Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 385-86 (5th Cir. 2003) (the "single incident as opposed to a pattern of violations" is a "narrow" exception to the 'pattern of violations' requirement that the Fifth Circuit has "been reluctant to expand"); *Bennett v. Pippin,* 74 F.3d 578 (5th Cir. 1996) (holding that municipal liability may arise under the single incident exception, provided the decision was made by a final policymaker responsible for the activity).

The Supreme Court has fleshed out the *Pembaur* "single incident" principle in subsequent cases.  First, a municipality may be held liable only for "acts which the municipality has officially sanctioned or ordered."  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 113 (1988) (quoting *Pembaur,* 475 U.S. at 480).  A municipality can incur liability based upon the isolated actions or decisions of municipal officials only if such an official possesses "final policymaking authority."  *Id.* (quoting *Pembaur,* 475 U.S. at 483).  Finally, "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." *Id.*  The Fifth Circuit has expressed reluctance to sustain a § 1983 claim based on a single

incident and the opinion of an expert.  *See Conner v. Travis Cty.,* 209 F.3d 794, 797 (5th Cir. 2000); *Synder v. Trepagnier*, 142 F.3d 791, 796-97 (5th Cir. 1998).[89]

Thus, the issue here is whether Plaintiffs have presented evidence to raise a genuine issue of fact under the single incident exception that the City has potential liability for unlawful arrests during Operation ERACER based on either: (1) Bradford's own conduct, or (2) conduct by others that Bradford personally approved.  Plaintiffs argue in this connection that Bradford approved the Smith and/or Jackson Plans, which led to illegal, unconstitutional arrests when implemented on August 16, 17, and 18, 2002.

To be subject to the single incident exception, a policymaker's single decision need not itself involve the violation of a penal statute, but it must, at a minimum, involve a violation of the Constitution or federal law.  *See Pembaur*, 475 U.S. at 484 (holding city could be liable under § 1983 for county prosecutor's decision to order search that violated petitioner's Fourth Amendment rights).  Nevertheless, violations of criminal law are the typical circumstance in which liability is permitted under *Pembaur*.  *See Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (finding municipal liability under single incident exception where sheriff allegedly raped plaintiff); *Turner v. Upton County*, 915 F.3d 133, 137 (5th Cir. 1990) (finding municipal liability under single incident exception where sheriff and county's district attorney allegedly conspired to subject plaintiff to trial on false charges based on

---

[89]    "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Praprotnik,* 485 U.S. at 123.  The parties agree that former Chief Bradford was at all pertinent times the individual with relevant policy-making authority for the HPD and thus the City.

fabricated evidence).  Citing *Pembaur*, Plaintiffs seek to stretch *Pembaur* to reach decisions by Bradford, *i.e.*, approval of the Smith and/or Jackson Plans, that did not expressly order illegal arrests but, in the Plans' implementation by others, resulted in spontaneous illegal arrests.  Plaintiffs cite no probative authority for this aggressive proposition.  They present no evidence that Bradford as City policymaker approved the use of arrest without probable cause as part of the Smith or Jackson Plans, as part of a "zero tolerance policy," or otherwise.  Plaintiffs' claims against the City based on a single incident of arrests without probable cause are dismissed.[90]

### F.    Failure to Supervise and Failure to Protect Claims

Plaintiffs also allege that Chief Bradford failed to supervise his staff, that Bradford was a municipal policymaker, and that as a policymaker his failure to properly supervise subjects the City to § 1983 liability.  *See Connor v. Travis County,* 209 F.3d 794, 796 (5th Cir. 2000) (stating that municipality and supervisors can both be liable for "failure to train"[91]).  This claim is rooted in Fourteenth Amendment substantive due process.  *See Cozzo v. Tangipahoa Parish Council,* 279 F.3d 273, 284 n.7.  Plaintiffs have the burden in defending against summary judgment to raise a genuine issue of material fact that Bradford failed to supervise his subordinates.  Plaintiffs purport to offer three grounds for their

---

[90]    Plaintiffs do not pursue claims against the City based on a formal or informal policy or practice of custodial abuse or excessive force.  There is no evidence of such a policy or practice or of Chief Bradford's approval of such measures in even one single incident.

[91]    Failure to train is a theory akin to "failure to supervise."  *See, e.g., Estate of Davis v. City of North Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005) (discussing in tandem liability for failure to train and failure to supervise).

insufficient supervision claims against Bradford.  They claim that Bradford failed: "(1) [to] properly train and supervise the other members of the command staff so as to prevent what occurred, (2) to protect Plaintiffs from unlawful arrest, detention and seizure, and (3) to protect Plaintiffs from the use of excessive force."[92]   In their claims against the City, Plaintiffs focus primarily on the first failure to supervise theory.  Nevertheless, for the sake of completeness, the Court addresses all three putative insufficient supervision theories in this section as pertains to the City's potential liability, and addresses Bradford's related defense of qualified immunity in Part IV.B, *infra*.

### 1.    Legal Standards

Where a plaintiff alleges a failure to train or supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *Estate of Davis v. City of North Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Smith v. Brenoettsy,* 158 F.3d 908, 911-12 (5th Cir. 1998), and citing *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003), and other cases).  In the failure to supervise context, the test for a supervisor's qualified immunity overlaps to some extent with the substantive analysis for liability under § 1983.  *Compare, e.g., Roberts v. City of Shreveport,* 379 F.3d 287, 291-92, 297 (5th Cir. 2005) (applying three-part test set forth *supra*; concluding that the plaintiffs'

---

[92]    Plaintiffs' Response, at 38.  Plaintiffs have abandoned their failure to train claim.  *See id.* at 48.

evidence "is insufficient to overcome the qualified immunity protecting [the police chief]"),

and *Estate of Davis,* 406 F.3d at 378-79 ("The issue of whether evidence is sufficient to

demonstrate deliberate indifference [under three-part test for supervisory liability] is a legal

issue that this court may review on interlocutory appeal" because "a district court's denial

of a claim of qualified immunity, to the extent that it turns on an issue of law, is an

appealable 'final decision.'"), *with Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452-53 (5th

Cir. 1994) (setting forth the "three-part test for supervisory liability" quoted *supra* as

standard for municipal liability on supervisory claim).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Board of

County Comm'rs v. Brown,* 520 U.S. 397, 410 (1997). "For an official to act with deliberate

indifference, the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Brenoettsy,* 158 F.3d at 912. No cause of action exists under § 1983 for mere negligent

supervision. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 691 (1978); *Sappington

v. Ulrich,* 868 F. Supp. 194, 199 (E.D. Tex. 1994).[93] "Deliberate indifference requires a

showing of more than negligence or even gross negligence." *Estate of Davis*, 406 F.3d at

381 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989). "Actions and

---

[93]    Plaintiffs inexplicably title the supervision section of their Response "Negligent Supervision."
The Court deems Plaintiffs' arguments to address the failure to supervise theory of liability
against the City.

decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Texas A&M University,* 168 F.3d 196, 201 (5th Cir. 1999).

2.      **Analysis of Failure to Supervise Allegedly Causing Unlawful Detention**

a.      **Absence of Supervision**

The Court concludes that there is evidence sufficient to raise a fact issue that Bradford personally failed to adequately supervise his subordinates, particularly his command staff, during the implementation of the Jackson Plan for Operation ERACER.  Both the Smith and Jackson Plans reflect the massive scope and scale of HPD's street racing crackdown, which necessitated strong and clear leadership from the Chief.[94]   A precursor to Operation ERACER was Bradford's approval of the Smith Plan.  As discussed above, Plaintiffs have submitted circumstantial evidence that Bradford was informed through seeing the Smith Evaluation and/or his conversations with his immediate subordinates that the implementation of the Smith Plan resulted in mass detentions of persons without particularized reasonable suspicion.  Plaintiffs also have presented circumstantial evidence that Bradford was aware of, and implicitly approved of, the Jackson Plan, which was unconstitutional on its face in that the Plan authorized detention of members of the public without any requirement of

---

[94]      *See* Smith Plan, at 2 (requiring 57 officers and superior personnel for overt operations and 30 officers and superior personnel for covert operations in the Smith Initiative); Jackson Plan, at 4 (calling for use of 55 personnel and 45 HPD vehicles in Operation ERACER).

individualized reasonable suspicion.[95]  However, to the extent Bradford did not have

knowledge of these matters other than the Smith Plan, this is evidence of his failure to

adequately supervise his subordinates.  Indeed, Bradford was out of town over the weekend

Operation ERACER was executed. The Operation was implemented three nights in a row,

yet there is no evidence that Bradford had any telephone or other contact with his immediate

subordinates (McClelland, Breshears, Smith, or Aguirre) or anyone else to monitor the effort.

Bradford takes the position that he believed that the Smith Plan  was the "model," yet failed

to ascertain immediately prior to Operation ERACER – or as it progressed over the three

nights – that his subordinates had carried out his orders to adhere to the Smith Plan.  This

evidence suffices to raise a fact issue that Bradford failed to supervise his senior subordinates

– and possibly others – to avoid Fourth Amendment problems of mass detentions without

individualized suspicion.[96]

---

[95]     *See supra* Part III.C.1.c.

[96]     Defendants mount a wholesale attack on Plaintiffs' putative law enforcement expert, Steven
D. Ashley.  *See* Motion to Strike Certain Opinions of Plaintiffs' Expert Steven D. Ashley
[Doc. # 85]. However, Plaintiffs in their Response to Defendants' summary judgment motion
rely on Ashley only in the most limited respects.  Indeed, Plaintiffs do not identify which
elements of the failure to supervise claims they believe Ashley's opinions support.  Plaintiffs
merely contend generally that Ashley opines "that there should have been more supervisors
on the scene, that they should have been more directly involved in what was going on, and
they should have acted to prevent what was occurring."  Plaintiffs' Response, at 37 (citing
Exhibit 82, Deposition of Steven Ashley, Vol. 2, p. 208); *see* Report of Steven D. Ashley,
Exhibit 85 to Plaintiffs' Response ("Ashley Report"), at 1.  Plaintiffs add that Ashley opines
that "the failure of the command staff, especially the first line supervisors present at the event
in question, to prevent the actions of the officers . . . demonstrates a significant break down
[*sic*] in the command, direction and control that should have been present in any police action
of this type."  Plaintiffs' Response, at 38; Ashley Report, at 1.  Ashley's theory of insufficient
(continued...)

### b.   Causal Link Between the Failure to Supervise and Violation of Plaintiffs' Rights

The second necessary element is that there be a causal link between the supervisor's failure to supervise and the violation of the plaintiff's rights.  The evidence reveals a genuine fact issue whether Bradford's failure to supervise the HPD command staff (and possibly mid-level officers) caused Plaintiffs' alleged unlawful detentions.  Among these fact issues is whether the absence of supervision by Bradford resulted in his command staff and their subordinate officers creating and implementing the Game Plan, if not the Jackson Plan itself, in violation of Bradford's directive that the Smith Plan as written was to be the model for Operation ERACER as a "zero tolerance" exercise.  Also, there is a fact issue as to whether it was Bradford's lack of supervision that caused HPD's superior and first-line officers who executed Operation ERACER to become plainly insensitive to the rights of individual Plaintiffs, members of the public, to be free from patently unlawful detention.[97]

---

[96]     (...continued)
supervision is vague, at best, especially when considered in light of the pertinent facts and issues of this case.  Significantly, Ashley does not explain (nor do Plaintiffs) what specifically *Bradford* should have done, what the allegedly necessary additional first-line supervisors would or should have done given the directives of the Jackson Plan and the Game Plan that were  issued by the superior command staff reporting to Bradford, or why having more first-line officers on site would have made any difference whatsoever regarding the likelihood of illegal detentions.  Ashley's cited opinions simply have not been shown to be material to the issues before this Court. Therefore, the Court does not address Defendants' many arguments that Ashley's putative expert opinions are inadmissible.

[97]     For instance, it is inconceivable, if true, that officers refused to consider Plaintiffs' receipts or other proof of patronage of the open businesses close in time to the detentions and arrests.

Plaintiffs' conclusory references to Ashley's opinions quoted in the preceding footnote do
(continued...)

c.      **Deliberate Indifference**

Finally, Plaintiffs' "failure to supervise" claims require proof that Bradford's lack of supervision amounted to deliberate indifference to their constitutional rights.[98]   Plaintiffs must demonstrate here that there is genuine fact issue regarding whether Bradford's alleged supervisory failure amounted to deliberate indifference to a significant risk of unconstitutional detentions. *Brenoettsy*, 158 F.3d at 912 (defendant must be shown to have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"); *see also Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004).   The Fifth Circuit makes clear that

---

[97]        (...continued)
not reveal why the opinions are probative on the causation element of the failure to supervise claim.  As noted above, Ashley's opinions are vague and the Court does not rely on them.

[98]        *See* Investigation Summary, Exhibit 76 to Plaintiffs' Response, at 209-14.  Plaintiffs do not cite but the Court is aware of Ashley's opinion on Bradford's alleged deliberate indifference:

It is my opinion that the supervisory procedures for an operation this size were inadequate, and that the Chief of Police, C.O. Bradford, as the designated policymaker on behalf of the City of Houston, was deliberately indifferent to the inadequacy of these supervisory procedures and further, contributed to this inadequacy, by telling his command staff to bypass Legal Services Department review in the planning of the operation.  It is my opinion that the inadequate supervisory procedures in place at the time directly caused the unlawful arrests and detention of Plaintiffs, and the injuries they suffered as a consequence of those unlawful arrests and detention."

Ashley Report, at 1; *see also* Deposition of Steven D. Ashley, Vol. 2, at 208; Plaintiffs' Response to Defendants' Motion to Strike Expert Report of Steven Ashley [Doc. # 143].  The Court declines to rely on this conclusory opinion, not even argued by Plaintiffs, in reaching its decision on Defendants' summary judgment motion.

"deliberate indifference is determined by a subjective standard of recklessness,[99] *McClendon* [*v. City of Columbia*]*, 305 F.3d [314,] 326 n.8 [(5th Cir. 2002)] (finding that a state actor's actual knowledge, rather than what a state actor should have known, is critical to the deliberate indifference inquiry)." *Hernandez,* 380 F.3d at 881.  The Fifth Circuit has "never required state officials to be warned of a specific danger.  Rather, [the court] ha[s] held that 'the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* at 881 (citing *Brenoettsy*, 158 F.3d at 912 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 659 (5th Cir. 1997)).  The Supreme Court has recently stated that deliberate indifference "can be inferred from the fact that the risk of harm is obvious." *Hope v. Pelzer,* 536 U.S. 730, 738 (2002).  Based on the following evidence, Plaintiffs have met their burden to raise a fact issue that Bradford was deliberately indifferent to their unlawful detentions.

Bradford directed that the Smith Plan was to be the model for the anti-street racing initiatives.  Plaintiffs present circumstantial evidence, when viewed in the light most favorable to Plaintiffs, that Bradford had seen, or had been informed orally of the key facts in, the Smith Evaluation, and therefore was aware that mass detentions had occurred during the Smith Initiative (*i.e.*, HPD's implementation of the Smith Plan).  There is also

---

[99]     "[A]n individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry" **if** deliberate indifference is not at issue. *See Cozzo v. Tangipahoa Parish Council,* 279 F.3d 273, 284 & n.7 (5th Cir. 2002).

circumstantial evidence that Bradford had seen or was told about the Jackson Plan, and thus knew that the Jackson Plan explicitly called for the unconstitutional mass detention of all persons found at the targeted sites.  Plaintiffs also have presented some evidence of indications that there may have been unconstitutional detentions at other "zero tolerance" operations.  Given Bradford's position as an experienced Police Chief and a longstanding member of HPD, there is a strong inference that he had knowledge of "zero tolerance" practices within HPD and was aware of the absence of definitive written policies concerning those operations.  Bradford thus knew that there was no consistent guidance for officers establishing the boundaries for "zero tolerance" operations, but nevertheless approved the use of "zero tolerance" tactics in the important anti-street racing initiatives.  Inexplicably, Bradford approved the Plans without review by HPD's legal department.  While HPD is under no duty to submit every proposed plan of operation to its legal department for advice, Bradford's directive that there was no need do so for a series of operations as massive as HPD's anti-street racing initiatives sent a signal to his subordinates that strict adherence to the law in connection with Operation ERACER was not high priority.  Plaintiffs' evidence allows the inference that Bradford's inadequate supervision was "obvious and obviously likely to result in a constitutional violation."  *Estate of Davis*, 406 F.3d at 381 (citations omitted).   Plaintiffs accordingly have met their burden to raise a genuine fact issue that Bradford was aware of facts from which an inference could be drawn that there was substantial risk of illegal detentions resulting from inadequate supervision in connection with implementation of the Jackson Plan for Operation ERACER.

This evidence collectively also creates a genuine fact issue that Bradford in fact drew the inference that his failure to supervise would cause harm to the public in that unlawful detentions would occur. *See Brenoettsy,* 158 F.3d at 912.[100]

> Whether a [supervisory] official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer,* 511 U.S. at 842 (internal citations omitted); *see also Brenoettsy*, 158 F.3d at 913. Plaintiffs have produced circumstantial evidence on summary judgment that Bradford actually drew the inference that officers' implementation of the Jackson Plan using "zero tolerance" strategies posed a "substantial risk of serious harm" to Plaintiffs. *See Farmer*, 511 U.S. at 842; *Brenoettsy*, 158 F.3d at 913.[101]

This evidence raises a genuine and material fact issue of Bradford's deliberate indifference to Plaintiffs' constitutional rights to be free from unlawful detention.

---

[100]    Plaintiffs assert in this regard that Bradford allowed Operation ERACER to take place in order to "set-up" a revenge against Aguirre. As farfetched as this claim may seem, it is not without some evidentiary support. As a result of Aguirre's allegations in an unrelated case, Bradford was criminally charged with perjury, was placed on leave with pay from September of 2002 until February 2003, and was forced to stand trial, where he was acquitted. *See* Deposition of C.O. Bradford, Exhibit 79 to Plaintiffs' Response, at 77.

[101]    "Whether a supervisory official actually drew this inference then becomes a factual question that a court of appeals lacks jurisdiction to hear on interlocutory appeal." *Brenoettsy*, 158 F.3d at 913 (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)); *Newton v. Black*, 133 F.3d 301, 308 (5th Cir. 1998) ("*Whether a prison official had the requisite knowledge of a substantial risk is a question of fact.*" (emphasis in original)).

Defendants' request to dismiss Plaintiffs' failure to supervise claims against the City, to the extent such claims are based in Plaintiffs' unlawful detention, is denied.

### 3. Analysis of Failure to Supervise Allegedly Causing Wrongful Arrest, Excessive Force, and Custodial Abuse

Although Plaintiffs have raised a fact issue regarding Bradford's deliberate indifference to their illegal detention, they have not raised a fact issue suggesting Bradford's deliberate indifference to the likelihood of their arrests without probable cause, their being subjected to excessive force, or their being subjected to custodial abuse. Without citation to any evidence, Plaintiffs argue that Bradford was aware "that there was a substantial chance innocent individuals who were not violating the law would be arrested," and that Bradford "would therefore know that they would be subject to flexcuffing," a practice used at Operation ERACER that, Plaintiffs argue, amounted to excessive force.[102] Plaintiffs also assert that Bradford knew they would be subject to custodial abuse because "the jail division knew" that mass arrests were planned, yet remained "totally unprepared, and kept Plaintiffs in intolerable conditions." These arguments lack any support in the record and amount to mere speculation. A review of the Smith and Jackson Plans contradicts Plaintiffs' bald assertions that Bradford knew illegal arrests were inevitable. The plans called for surveillance, conducted with the purpose of establishing probable cause for each person arrested. Similarly, there is no indication from the Plans or otherwise that Bradford received any information that his officers' implementation of the Plans for Operation ERACER would

---

[102]     *See* Plaintiffs' Response, at 41-42.

involve excessive force, or that there was a high risk that custodial abuse would occur.[103] The Supreme Court has emphasized that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown,* 520 U.S. at 410. Plaintiffs have not presented evidence that there was a supervisory failure by Bradford that was likely to result in unlawful arrests, use of excessive force, or custodial abuse, or that he was deliberately indifferent to such risks. The Court thus concludes that Plaintiffs have not met their summary judgment burden that Bradford acted with deliberate indifference to the potential for these violations and these claims are dismissed.

### 4. Conclusion on Failure to Supervise Claims

When viewed in the light most favorable to Plaintiffs, there is evidence sufficient to create genuine fact issues that Bradford failed to supervise his superior officers in regard to the massive and complex anti-street racing initiatives planned and executed by HPD in the summer of 2002, that his failure of supervision caused violations of Plaintiffs' rights, and that the supervisory failure amounted to deliberate indifference to the likelihood of unlawful detention of members of the public. However, Plaintiffs have not raised a fact issue on their claims that Bradford failed to supervise and acted with deliberate indifference regarding

---

[103]     Plaintiffs' assertion that "the jail division knew" that mass arrests were planned (*see* Plaintiffs' Response, at 48) is insufficient to raise a fact issue that Bradford was deliberately indifferent to potential custodial abuse. Similarly, the Court is unpersuaded that use of "flexcuffs" *per se* amounts to use of excessive force.

likely unlawful arrests, use of excessive force, or the occurrence of custodial abuse.  These failure to supervise claims are dismissed.

### 5.    Analysis of Failure to Protect Claims

Plaintiffs assert insufficient supervision theories based on Bradford's alleged "failure to protect" them from unlawful arrest, detention, seizure, excessive force, and custodial abuse.  Plaintiffs correctly note that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of [*e.g.*,] excessive force may be liable under section 1983."  *Hale v. Townley,* 45 F.3d 919, 919 (5th Cir. 1995).  However, as Plaintiffs concede, Bradford was not present at the scene and was, in fact, out of town on the evenings Operation ERACER was conducted.  Without citing to any legal authority, Plaintiffs seek to extend the *Hale* rule of bystander liability to officers who "know" there is a "substantial risk" of potential violations of constitutional rights and fail to prevent the occurrence.  The Court concludes that Plaintiffs' "failure to protect" claims against a supervisor not present at the scene are legally indistinguishable from the failure to supervise claims that this Court has already addressed in this Part.  Plaintiffs' inadequate supervision claims premised upon Bradford's "failure to protect" them are therefore dismissed.

### G.    Conspiracy

In their Complaint, Plaintiffs assert a conspiracy claim against the City, Bradford, and Aguirre.  Plaintiffs do not defend this claim at all in their Response to Defendants' Motion, and they have abandoned this theory.  Plaintiffs' conspiracy claim is dismissed.

### H.    Conclusion on Supervision Claims Against City

Plaintiffs may not pursue claims against the City based on wrongful arrests because there is no evidence of a City policy or custom permitting or condoning such arrests.  The Court, however, denies the City's motion for summary judgment dismissing Plaintiffs' claims against it based on their alleged policy or practice of wrongful detention, and those claims may proceed.  Plaintiffs may also assert their failure to supervise claim, but only to the extent that such claim is based in their illegal detentions.  Plaintiffs' failure to protect and conspiracy claims dismissed.

Plaintiffs allege that their constitutional rights were violated in various ways – for example, by unlawful arrest, excessive force, and custodial abuse, in addition to unlawful detention.  It is not clear, and the parties have not addressed, what injuries (and damages) Plaintiffs can claim were caused by the detention, which is actionable, as opposed to the other inactionable wrongful conduct.

## IV.    CLAIMS AGAINST BRADFORD

Bradford moves for summary judgment on all claims against him.  The Court has dismissed Plaintiffs' claims against the City that are based in allegations of a policy of illegal arrest, excessive force, and custodial abuse, as well as Plaintiffs' "failure to protect" and conspiracy claims.  The reasons that these claims fail as a matter of law against the City apply to defeat Plaintiffs' comparable causes of action against Chief Bradford.  Thus, these claims are dismissed as to Bradford as well.

The Court also has concluded that Plaintiffs may pursue claims against the City alleging that the facially unconstitutional Jackson Plan and/or the City's customary use of "zero tolerance" resulted in violations of Plaintiffs' constitutional rights. In addition, the Court has permitted Plaintiffs to proceed on their claim that Bradford failed to supervise his staff so as to prevent Plaintiffs' unlawful detentions. Bradford responds that, even if these policies or practices result in § 1983 liability for the City, he is entitled to qualified immunity. Finally, Plaintiffs also bring state law claims against Bradford alleging false arrest/imprisonment, to which Bradford argues that Plaintiffs cannot demonstrate the requisite personal involvement and that, in any event, he is entitled to official immunity. These arguments are addressed in turn.

## A.    **Section 1983 Claims Based on Policy or Practice**

Plaintiffs' remaining Fourth Amendment § 1983 claims against Bradford are based on the Jackson Plan, which called on its face for unconstitutional detentions, and the City's "zero tolerance" custom, which may have been understood to encompass illegal detentions. Bradford argues that, even assuming he approved the Jackson Plan or the use of "zero tolerance" in Operation ERACER, he is entitled to qualified immunity because he acted reasonably. He asserts that it is reasonable for him to have believed that HPD's experienced and "well-trained" captains would utilize "zero tolerance" in a constitutional manner.[104] The Court concludes for reasons set forth below that Plaintiffs have produced evidence sufficient

---

[104]    *See* Affidavit of Assistant Chief M.I. Montalvo, Exhibit 7 to Defendants' Motion; Affidavit of Commander Albert Rodriguez, Exhibit 8 to Defendants' Motion.

to raise a fact issue precluding summary judgment on Bradford's qualified immunity defense on Plaintiffs' Fourth Amendment unlawful detention policy and practices claims.

Officials sued in their individual capacities are protected by qualified immunity unless the act violates a constitutional right clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466-67 (5th Cir. 1998). To avoid summary judgment, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law *and facts available to them*." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993), *cert. denied*, 511 U.S. 1019 (1994) (emphasis added). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council--President Gov't*, 279 F.3d 273, 284 (5th Cir. 2002) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 456 (5th Cir. 2001)). "The Supreme Court has characterized the doctrine as protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In assessing qualified immunity, the Court must conduct a bifurcated analysis. *See, e.g., Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). First, the Court must decide whether the plaintiff alleged a violation of a clearly established constitutional right. *Id.* A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Collins*, 382 F.3d at 537. Second, a court must address whether

the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537.  "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right.   *Thompson,* 245 F.3d at 457 (citing *Anderson,* 107 S.Ct. at 3040; *Malley,* 106 S.Ct. at 1096) (emphasis in original).  "Thus, an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry" in the context of a Fourth Amendment claim.[105]  *See Cozzo,* 279 F.3d at 284.

At the summary judgment stage of a § 1983 action, a defendant asserting qualified immunity is not required to establish the defense beyond peradventure, as he would have to do for other affirmative defenses.  "The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity.  It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity.  Once the [movant] *asserts* this affirmative defense, the burden *shifts* to the plaintiff to rebut it." *Cousin v. Small*, 325 F. 3d 627, 632 (5th Cir. 2003) (citations omitted) (emphasis in original).  Plaintiff bears the burden of negating Defendant's claim of qualified immunity. *See Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489-90 (5th Cir. 2001); *Foster v. City of Lake*

---

[105]    In contrast, in the context of a failure to supervise claim, an individual defendant's subjective state of mind is relevant to the defendant's deliberate indifference.  *See Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.,* 380 F.3d 872, 881 (5th Cir. 2004).  A state's failure to supervise officers is a Fourteenth Amendment substantive due process claim, not a Fourth Amendment claim regarding unlawful search or seizure.  *See Cozzo,* 279 F.3d at 284 n.7; *infra* Part IV.B.

*Jackson*, 28 F.3d 425, 428 (5th Cir. 1994); *Salas v. Carpenter*, 980 F.2d 299, 305-06 (5th Cir. 1992).

To defeat the first prong of the qualified immunity test, Plaintiffs in this case assert that their right to be free from unreasonable detention was clearly established prior to the 2002 events at issue. *See, e.g., Sanchez,* 139 F.3d at 466-67. The Court agrees. The issue, however, is not whether the broad right asserted was well established, but whether it objectively would have been sufficiently clear to a person in Bradford's circumstances that the policy under scrutiny represented a violation of that right. *See, e.g., Sanchez,* 139 F.3d at 466-67 ("The Supreme Court has warned against vague or general assertions of constitutional rights and has required a § 1983 plaintiff to state with specificity the constitutional right that has been allegedly violated – otherwise, liability could be imposed in every case." (citing *Anderson,* 483 U.S. at 639)). The Court concludes that the unconstitutionality of the specific detention component of the Jackson Plan was clearly established at the time of Operation ERACER. *See Edmond*, 531 U.S. at 46-47; *Collins*, 382 F.3d at 537-38. Similarly, the mass detention aspect of HPD's "zero tolerance" custom alleged by Plaintiffs, if true, is clearly unconstitutional. Thus, Plaintiffs have produced evidence that raises fact issues to satisfy their summary judgment burden on the first prong of the qualified immunity test.

On the second prong of the test, Plaintiffs claim that Bradford's actions are objectively unreasonable because the Constitution does not permit the "contain and scrutinize" philosophy espoused by the Jackson Plan and allegedly customarily used by HPD

as part of "zero tolerance."  There is a genuine fact issue regarding whether Bradford knew

that the implementation of the Smith Plan (as revealed by the Smith Evaluation and other

circumstantial evidence) just prior to Operation ERACER involved detention of people

without individualized reasonable suspicion for periods as long as two hours.  Plaintiffs have

raised fact issues regarding whether Bradford knew that the Jackson Plan called for a round-

up and detention of all persons who happened to be in the parking lots of open businesses

the nights the Plan was implemented, and whether an objectively reasonable officer "would

or should have known" that such a plan did not pass constitutional muster.  *See Collins,* 382

F.3d at 544.[106]  Plaintiffs have thus met their summary judgment burden on Bradford's plea

of qualified immunity and the § 1983 claims against Bradford concerning unlawful

detentions will not be dismissed.[107]

---

[106]    There are also fact issues about Bradford's knowledge and the reasonableness of his actions
as to those Plaintiffs who were detained (and arrested) on August 17, 2002, because
Operation ERACER took place over three different nights, August 16, 17 and 18, 2002.  The
operation consumed substantial HPD resources.  If Bradford was kept promptly apprised by
telephone of events on August 16 in the Operation, he likely had knowledge of the mass
detentions, thereby bolstering Plaintiffs' unreasonableness contentions concerning arrests on
August 17 and 18.  However, the parties point to no such evidence in the record, and
indications are to the contrary.

[107]    Plaintiffs also claim that Bradford's actions were objectively unreasonable because he let the
Jackson Plan as implemented go forward "for the purpose of setting Aguirre up for a fall."
Bradford's subjective motivations are irrelevant to whether his actions were *objectively*
reasonable.  *Thompson,* 245 F.3d at 457 (individual defendant's subjective state of mind is
irrelevant to the qualified immunity inquiry).

**B.**     **Section 1983 Claims Based on Failure to Supervise and Failure to Protect**

Plaintiffs claim that Bradford failed to: "(1) properly train and supervise the other members of the command staff so as to prevent what occurred, (2) to protect Plaintiffs from unlawful arrest, detention and seizure, and (3) to protect Plaintiffs from the use of excessive force."[108]  Plaintiffs have now abandoned their "failure to train" claim.[109]  In Part III.F *supra,* the Court dismissed Plaintiffs' "failure to protect" claims and their claims based in supervisory failures relating to arrests without probable cause, excessive force, and custodial abuse.   The Court held that there is insufficient evidence of Bradford's deliberate indifference to sustain failure to supervise claims regarding the illegal arrests, the alleged use of excessive force, and the alleged occurrence of custodial abuse.  The Court also held that there is no evidence of the requisite personal involvement to sustain a failure to protect claim because Bradford was out of town on the evenings at issue.  For the same reasons these claims against the City are legally insufficient, they are dismissed as to Bradford as well.

The Court did not dismiss Plaintiffs' claim against the City based in Bradford's alleged failure to supervise so as to prevent Plaintiffs' illegal detention.  Bradford asserts qualified immunity on this remaining claim.  As the Court discussed in Part IV.A, *supra,* the qualified immunity analysis requires the Court to decide (1) whether the plaintiff alleged a violation of a "clearly established" constitutional right, and (2) whether the defendant's

---

[108]     Plaintiffs' Response, at 38.

[109]     *See id.* at 48.

"actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004).  As the Court held above, Plaintiffs have alleged a violation of a clearly established constitutional right.  Additionally, there are genuine fact issues regarding Bradford's knowledge and actions regarding "zero tolerance" practices and their use in the Jackson Plan and Operation ERACER as implemented on August 16-18, 2002, and whether his actions were objectively reasonable in light of clearly established Fourth Amendment law.

Recent Fifth Circuit authority indicates that in the insufficient supervision context, to defeat a supervisory officer's qualified immunity, a plaintiff must also raise genuine, material factual issues that:  "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Estate of Davis,* 406 F.3d at 381.  The Court has concluded in *supra* Part III.F.2 that Plaintiffs have raised genuine, material factual issues regarding whether Bradford failed to supervise, whether Bradford's failure caused Plaintiffs' illegal detentions, and whether Bradford's failure reflected deliberate indifference to Plaintiffs' constitutional rights.  Thus, the Court cannot conclude as a matter of law that Bradford is entitled to qualified immunity on Plaintiffs' failure to supervise claim based in their illegal detentions.[110]

---

[110]    The Court has held in *supra* Part III.F. that there is insufficient evidence of Bradford's
(continued...)

### C.    **State Law Claims**

Plaintiffs assert in the Complaint claims against Bradford based on assault and false

arrest/imprisonment.  This Court dismissed Plaintiffs' assault claims in its Memorandum and

Order dated October 27, 2003, so that claim will not be further considered.

Bradford argues — with good basis — that Plaintiffs have failed to establish a valid

claim of false arrest/imprisonment against him, and that he is entitled to official immunity

under Texas law.  "The elements of false arrest and false imprisonment are similar enough

to be indistinguishable." *Villegas v. Griffin Indus.*, 975 S.W.2d 745, 754 (Tex.App.–Corpus

Christi 1998, no pet.).  Under Texas law, to succeed on a false arrest and imprisonment claim

a plaintiff  must show the occurrence of:  (1) a "willful detention; (2) without consent; and

(3) without authority of law." *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.

2002); *see also Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985).

"[L]iability for false imprisonment [can extend] beyond those who willfully participate in

detaining a complaining party to those who request or direct the detention." *Rodriguez*, 92

S.W.3d at 507; *see also Villegas*, 975 S.W.3d at 754; *Lewis v. Continental Airlines*, 80

F. Supp. 2d 686, 695 (S.D. Tex. 1999) (Crone, J.) (liability for false arrest may extend to

defendant who "directs or requests" the unlawful arrest).  "[A] plaintiff must show that the

defendant clearly directed or requested the arrest . . . 'the equivalent, in words or conduct,

---

[110]        (...continued)
        deliberate indifference to sustain Plaintiffs failure to supervise claims regarding the illegal
        arrests, the alleged use of excessive force, and the alleged occurrence of custodial abuse.
        Bradford is thus entitled to qualified immunity on these claims.

of "Officer, arrest that man!" " *Rodriguez,* 92 S.W.3d at 506 (quoting RESTATEMENT (SECOND) OF TORTS § 45A cmt. c).

Plaintiffs do not present evidence (or even allege in their Complaint) that Bradford personally participated in the false arrest or imprisonment of Plaintiffs on others.  Plaintiffs do not assert that Bradford was present on the night of the arrests nor that he had any contact with any Plaintiff at K-Mart or James Coney Island or subsequently at the jail.  Indeed, Defendants present uncontroverted evidence that Bradford was not in Houston on the weekend in question.  Plaintiffs only assert and present evidence that Bradford was the person who ultimately approved the Smith and Jackson Plans and associated anti-street racing initiatives.  As the Court has discussed above, Plaintiffs do not present any evidence that the Smith or Jackson Plans called for arrests or imprisonments without probable cause.  Nor is there evidence that Bradford's possible knowledge and approval of the anti-street racing initiatives rise to the level of directing or requesting *unlawful* arrest.[111]

Plaintiffs rely on three cases in their Response to Defendants' Motion, but they are inapposite.  Each involves defendants who — without any delegation of authority — ordered or directed an unlawful arrest.  *See Castillo v. Canavati*, 152 S.W.2d 785 (Tex. Civ. App.– San Antonio 1941, writ ref'd w.o.m.); *Smith v. Burdett*, 114 S.W.2d 384 (Tex. Civ. App.– Waco 1938, no writ); *Gold v. Campbell*, 117 S.W. 463 (Tex. Civ. App.– San Antonio 1909,

---

[111]     Plaintiffs similarly do not present evidence (indeed, do not argue) that the "zero tolerance" policy called for unlawful arrests.

77

no writ).  Plaintiffs have not presented evidence sufficient to create a fact issue that the Smith or Jackson Plans called for the *unlawful arrest* of individuals.

Plaintiffs argue that the burden is on Bradford to come forward with evidence that Plaintiffs' arrest and imprisonment were legally justified.  *See* Plaintiffs' Response, at 51 (citing *Castillo,* 152 S.W.2d at 787).  Plaintiffs' approach is in error in light of current Texas civil law.  "When [an] alleged detention results from an unlawful arrest, to prove [the] instigation [necessary for a false arrest], a plaintiff must show that the defendant clearly directed or requested the arrest."  *Rodriguez*, 92 S.W.3d at 506.  Because Plaintiffs have not supplied any evidence to meet this burden, Bradford's motion for summary judgment on Plaintiffs' claims for unlawful arrest or imprisonment is granted.  The Court therefore need not address Chief Bradford's official immunity defense as to these claims

## V.     <u>CONCLUSION AND ORDER</u>

The Court concludes that Plaintiffs may proceed with their § 1983 claim against the City and Bradford based in the facially unconstitutional Jackson Plan.  To succeed on this claim, Plaintiffs must prove that Bradford personally approved of the specific Jackson Plan.  Plaintiffs may also proceed with their § 1983 claim against the City and Bradford based on a "zero tolerance" custom of detention without reasonable suspicion.  To succeed on this claim, Plaintiffs must prove the existence of such a custom and Bradford's knowledge or constructive knowledge of the custom.  In addition, Plaintiffs may proceed against the City and Bradford on their claim that Bradford failed to supervise his staff so as to prevent Plaintiffs' unlawful detention.

The Court finds there are genuine questions of material fact that preclude summary judgment in Bradford's favor on qualified immunity on Plaintiffs' claims against Bradford based on a policy, practice, or custom of detention without reasonable suspicion, and based on Bradford's failure to supervise so as to prevent Plaintiffs' illegal detentions.

All other § 1983 claims against the City and Bradford are dismissed.  Plaintiffs' state law claims against Bradford are dismissed.  It is hereby

**ORDERED** that Defendants The City of Houston and C.O. Bradford's Motion for Summary Judgment [Doc. # 134] is **GRANTED in part** and **DENIED in part**.

SIGNED at Houston, Texas, this **25th** day of **July, 2005.**

Nancy F. Atlas
United States District Judge