## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CORI LOPEZ, *et al.,* | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-2297 |
| | § | |
| THE CITY OF HOUSTON, *et al.,* | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER
## ON PLAINTIFFS' EXPERTS

Pending before the Court in this civil rights case are a Renewed Motion to Exclude the Opinions of Plaintiffs' Expert Linda Wallis [Doc. # 189] ("Wallis Motion") and a Motion to Exclude the Opinions of Plaintiffs' Expert Marilyn Manning [Doc. # 196] ("Manning Motion") (collectively, "Defendant's Motions") filed by Defendant City of Houston ("Defendant").[1]  Plaintiffs have responded to Defendant's Motions [Doc. # 199] and Defendant has replied [Docs. # 200, 201].  Defendant's Motions are ripe for decision.  The Court has considered carefully the parties' briefing, the applicable authorities, and all matters of record.  The Court concludes that Defendant's Motions should be **denied** and that Defendant's challenges of Plaintiffs' experts' methodology and conclusions address matters

---

[1]     Defendant has filed numerous exhibits to Defendant's Motions.  *See* Appendix I to Wallis Motion [Doc. # 190]; Appendix II to Wallis Motion [Doc. # 191]; Appendix III to Wallis Motion [Doc. # 192]; Appendix IV to Wallis Motion [Doc. # 193]; Appendix V to Wallis Motion [Doc. # 194]; Appendix I to Manning Motion [Doc. # 197]; Appendix II to Manning Motion [Doc. # 195]; Appendix III to Manning Motion [Doc. # 198].

the jury may consider in determining what weight, if any, to give the experts' testimony.

I.   **BACKGROUND**

      A.   **August 2002 Raids**

      The sixty-two Plaintiffs allege the following facts in their Second Amended Complaint [Doc. # 119].  On the evenings of August 16, 17 and 18, 2002, Houston Police Department ("HPD") officers conducted a series of raids in the parking lots of certain retail establishments on Westheimer Road in Houston, Texas.  HPD intended through the raids to address illegal street racing in the area.  More than seventy armed HPD officers, backed by helicopters, tow trucks and jail transports, descended upon the parking lots and indiscriminately arrested Plaintiffs and everyone else on the premises.  More than 300 people were detained and arrested.  HPD officers brandished weapons, verbally abused the detainees, and held the detainees for four or five hours in designated locations in the parking lots.  The officers refused to examine the detainees' purchase receipts or consider other evidence of the detainees' lawful presence on the properties.

      The officers placed the Plaintiff detainees under arrest for "attempted trespassing" and tied their wrists with tight plastic zip ties.  When some complained, officers tightened the plastic cuffs further.  Many Plaintiffs suffered bruising, swelling, and numbness of the wrists, hands, and arms.  The officers also searched the detainees.  Some female detainees were searched in front of male officers and were subjected to jests and humiliation.  Despite the heat of summer, the officers forced Plaintiffs to sit or kneel for hours on the ground next to garbage bins.  Some Plaintiffs were not allowed use of restrooms and soiled themselves.

Some suffered dehydration.

The officers transported the Plaintiffs to jail in hot, overcrowded buses.  At the jail, many Plaintiffs were forced to wait outside for several hours while other detainees were processed.  Inside, Plaintiffs and the other detainees were held in overcrowded cells with dangerous criminals.  The cells also were dirty and uncomfortable.  Jail personnel and officers verbally taunted them.  Those who complained were processed last.  Those who refused to plead guilty were held longer than others and were not taken before a magistrate. Plaintiffs spent differing amounts of time in jail; some were released after as few as four hours; many were imprisoned in excess of twenty hours.

Plaintiffs sue the City of Houston and other defendants pursuant to 42 U.S.C. § 1983 for injuries resulting from the raids.

Other than the parties' briefing and this ruling on the Defendant's Motions, this case is presently administratively stayed pending the outcome of an interlocutory appeal filed by Defendant C.O. Bradford, former HPD police chief, regarding this Court's partial denial of qualified immunity.

**B.    Plaintiffs' Experts**

Plaintiffs have engaged Linda Wallis and Marilyn Manning (collectively, "Plaintiffs' Experts") to testify that fifty-two of the sixty-two Plaintiffs suffer from specified anxiety disorders, including Post-Traumatic Stress Disorder ("PTSD"), because of events experienced and witnessed during the August 2002 raids.  Defendant moves to strike these experts' testimony and reports on the grounds that the conclusions are unreliable and are the

result of improper methodology.

Wallis has a Masters of Science in Social Work from the University of Texas Graduate School of Social Work and has practiced as a social worker for approximately forty years. She is licensed in Texas as a Master Social Worker-Advanced Clinical Practitioner, Professional Counselor, and Social Psychotherapist. In her practice, Wallis has experience diagnosing and treating PTSD. Wallis is married to Olney Wallis, one of the attorneys representing Plaintiffs in this lawsuit.

Manning graduated in 1968 from the University of Houston with a Masters Degree in Education specializing in counseling. She is licensed by the state of Texas as a Licensed Professional Counselor, which entitles her to practice as a psychotherapist. Manning has been in private practice since 1977. In her practice, Manning has experience diagnosing and treating PTSD.

Wallis and Manning used the same methods to examine Plaintiffs. They first reviewed a summary of the relevant factual background for each Plaintiff compiled by Bonnie Fulbright, an employee of Plaintiffs' counsel ("Fulbright Summary"). The information in the Fulbright Summary included: (1) a client intake form containing information regarding each Plaintiff and his or her relatives, including contact information, work history, educational background, criminal history, past legal issues, and past medical problems; (2) a Plaintiff's own written account of the raids; and (3) a Plaintiff's oral account of the raid, as summarized by Fulbright.

In addition to the Fulbright Summary, Plaintiffs' Experts reviewed each Plaintiff's

response to a written questionnaire titled "K-Mart Master Checklist" ("Checklist").  Wallis

and Dr. Kenneth Lehrer, an economist, devised this document.  The Checklist, given to each

Plaintiff to complete, asks for contact information, educational background, and work

history.  It also asks questions intended to gauge the economic impact of the raids.  Dr.

Lehrer devised the economic questions.  The Checklist also asked each Plaintiff personally

to write a short summary of the effect the raid and arrest had on him or her and a description

of the events.[2]  The Checklist finally asks twenty questions, devised by Wallis, addressing

whether the raid and arrest affected the Plaintiff's mental state.  The following is a sample

of the questions that the Checklist included: "FROM THE DATE OF THE ARREST AND

BECAUSE OF THE ARREST": "Have you had any increased anxiety, tension or worries?";

"Have you felt depressed or sad for no reason?"; "Did your arrest affect your ability to

function?"; "Do you have nightmares or sleep problems?"; "Have you sought any

professional treatment?"; "Do you still think about what happened to you?"; and "Are you

concerned about going out where a crowd might be?"[3]

After reviewing the individual Fulbright Summaries and the responses to the

Checklist, Wallis interviewed forty-three Plaintiffs and Manning interviewed another nine

---

[2]     The Checklist stated:  "Please write a small individual story (1 or 2 paragraphs) regarding individual problems with respect to the arrest, including lack of advancement and /or any special problem as a result of the arrest.  Write down what happened to you during the raid and arrest.  Looking back, how has it affected you?"  *See* Sample Checklist, Exhibit 8 to Wallis Deposition, contained in Appendix V to Wallis Motion, at 3.

[3]     *See* Sample Checklist, Exhibit 8 to Wallis Deposition, contained in Appendix V to Wallis Motion, at 3–6.

Plaintiffs.  Each interview lasted forty-five to sixty minutes.  Wallis and Manning discussed their interviews and conferred regarding the diagnosis of each Plaintiff.

Wallis produced an Amended Report containing her diagnoses of the forty-three Plaintiffs she interviewed.[4]  In her report, Wallis states her opinion that forty of the Plaintiffs suffer from PTSD, two suffer from adjustment disorder with anxiety, and one suffers from adjustment disorder.  Manning also produced an Amended Report containing her diagnoses of the nine Plaintiffs she interviewed.[5]  Manning concluded that eight suffered from PTSD and that one suffered from adjustment disorder.

## II.    ANALYSIS

### A.    Standard for Expert Testimony

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  FED. R. EVID. 702.

The trial judge as a threshold matter must determine whether the proffered witness is qualified to give the expert opinion he seeks to express.[6]  *Kumho Tire Co. v. Carmichael*,

---

[4]    Amended Report of Linda Wallis, contained in Appendix II to Wallis Motion.

[5]    Amended Report of Marilyn Manning, Exhibit 10 to Manning Deposition, contained in Appendix III to Manning Motion.

[6]    Defendant initially challenged Wallis' qualification as an expert in a Motion to Strike Affidavit of Wallis [Doc. # 157] and a Renewed Motion to Strike Affidavit of Wallis [Doc. # 165].  In

526 U.S. 137, 156 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.*

Under *Daubert*, the district court also must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether that reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing And Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 592–93). This so-called "gate-keeping" obligation applies to all types of expert testimony, not just "scientific" testimony. *Id.* at 617–618 (citing *Kumho Tire*, 526 U.S. at 147). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. A court "must ensure the expert uses reliable methods to reach his opinions; and those

---

these motions, Defendant argued that the medical diagnosis of PTSD is an opinion on which Wallis, a social worker, is not competent to testify. In a Memorandum and Order dated August 12, 2005 [Doc. # 169] ("August Order"), the Court concluded that "Wallis is qualified to diagnose characteristics of PTSD, a well-recognized psychological condition, and to give an opinion on the causes of the condition." August Order, at 7. Defendant does not challenge the qualifications of Wallis or Manning in the instant motions.

opinions must be relevant to the facts of the case."[7]  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation.  *Daubert*, 509 U.S. at 590.  To demonstrate reliability, the proponent of the expert testimony must present "some objective, independent validation of the expert's methodology.  The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."  *Moore*, 151 F.3d at 276.  Courts must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data.  *See, e.g., Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994).  Four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance.  *Watkins*, 121 F.3d at 989 (citing *Daubert*, 509 U.S. at 593–94).  This analysis, however, is a flexible one.

---

[7]     *Daubert*'s "relevancy" requirement stems from Rule 702's mandate that an opinion be helpful to the trier of fact.  *See* FED. R. EVID. 702.  Defendant does not challenge the relevancy of the diagnoses.  The probative value of expert psychiatric or psychological proof regarding the cause of a plaintiff's emotional distress is well-recognized. *See Skidmore*, 188 F.3d at 617–18 (Fifth Circuit affirming lower court's admission of expert's PTSD diagnosis as evidence of emotional distress).  The evidence proffered in this case clearly has some probative value and would assist the trier of fact in understanding Plaintiffs' claims for damages.

"[N]ot every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325 (citing *Kumho Tire*, 526 U.S. at 151).

Rule 704 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a).  The Fifth Circuit, however, "has repeatedly held that Rule 704 does not allow an expert to render conclusions of law." *United States v. $9,041,598.68*, 163 F.3d 238, 255 (5th Cir. 1998) (citing *Snap-Drape, Inc. v. Comm'r of Internal Revenue,* 98 F.3d 194 (5th Cir. 1996)).

### B.     Discussion

Defendant moves to strike Plaintiffs' Experts' conclusions on the grounds that they lack reliability generally and that the methodology used to reach the opinions is faulty in various respects.  Most of Defendant's objections are aimed at Plaintiffs' Experts' forty-eight diagnoses of PTSD, not at the four diagnoses of other disorders (two for adjustment disorder with anxiety and two for adjustment disorder).  Wallis' and Manning's opinions rely on materially identical foundations.  Defendant therefore lodges the same criticisms against both experts.[8]  The Court therefore will consider the admissibility of the two experts' opinions jointly.

More particularly, Defendant challenges Plaintiffs' Experts' opinions in a variety of

---

[8]     Manning Motion, ¶ 9.

ways.  Defendant asserts on a general level that the experts personally are not independent of Plaintiffs' attorney, the experts' diagnoses are based on insufficient information, and the diagnoses are purely litigation driven.  Defendant urges that the experts' methodology is fundamentally faulty and thus unreliable in that Plaintiffs' Experts, in reaching these diagnoses, (1) used background information generated by Plaintiffs' attorney's staff, not the experts' personally; (2) made a preliminary diagnosis before personally meeting with each Plaintiff; (3) failed to consider events in Plaintiffs' lives subsequent to the August 2002 raids that might have caused PTSD; (4) relied on the Checklist, which allegedly was devised by Dr. Lehrer, an economist; (5) failed to utilize other recognized diagnostic scales; (6) did not perform a differential diagnosis to rule out other potential causes of the reported symptoms; (7) failed to rule out malingering; and (8) did not use sufficiently diverse sources of information regarding reported symptoms.  Plaintiffs contend that their experts' methodology satisfies professional standards and that the experts' conclusions are admissible evidence under *Daubert*.

The Court has carefully reviewed Plaintiffs' Experts' reports, affidavits, supporting materials, and deposition testimony, using the *Daubert* rubric.  The Court concludes that Manning and Wallis used sufficiently reliable methods and data to reach their conclusions, and those conclusions are admissible at trial.

PTSD is the designation assigned to a group of certain identifiable symptoms in the fourth edition of the Diagnostic and Statistical Manual of the American Psychiatric

Association ("DSM-IV").[9]  *See* Nicholas J. Motherway, *Post-Traumatic Stress*, 49 AM. JUR. PROOF OF FACTS 2d 73 (West 2005).  The parties agree the DSM-IV is the authoritative medical treatise regarding the diagnosis of PTSD and other anxiety orders.  According to the DSM-IV, PTSD is a syndrome comprised of three clusters of signs and symptoms: (1) repeatedly re-experiencing the precipitating trauma; (2) avoidance of activities and stimuli associated with the trauma; and (3) heightened arousal.  *See* DSM-IV, at 468.  A PTSD diagnosis is proper only if a person has been exposed to an event that qualifies as a "traumatic stressor."  *Id.* at 467.  A traumatic stressor includes a person experiencing or witnessing an event that involved threatened death or serious injury where the person's response involved intense fear or helplessness.  *Id.*  The symptoms must persist for at least one month and must cause distress or impairment.  *Id.* at 468.

Plaintiffs' Experts testified repeatedly and in detail how they applied the standards set forth in the DSM-IV when diagnosing Plaintiffs.[10]  They also reviewed Plaintiffs' responses to the Checklist—the responses to the questions devised by Wallis probe the PTSD diagnostic criteria set forth in the DSM-IV.  For instance, the Checklist requests a one or two paragraph summary of the arrest experience.  This request inquires about a Plaintiff's traumatic stressor criterion.  The Checklist also inquires about post-arrest fears, disturbing

---

[9]     American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000).  Defendant submitted excerpts from the DSM-IV regarding PTSD.  *See* Exhibit 5 to Manning Deposition, contained in Appendix II to Manning Motion.

[10]    Wallis Deposition, contained in Appendix III to Wallis Motion, at 56, 66, 77, 109; Manning Deposition, contained in Appendix I to Manning Motion, at 27, 83–84, 89–90, 92.

thoughts, nightmares, and recurring recollections of the arrest.  These questions relate to the "repeatedly re-experiencing the trauma" criterion.  Several questions gauge the extent a Plaintiff avoids activities and stimuli associated with the trauma, also a criterion for a PTSD diagnosis.  For example, the Checklist asks about fears of post-arrest people or places, whether there is paranoia relating to police officers, concerns about going to crowded areas, and decreased participation in events.  The Checklist additionally seeks information about the "heightened arousal" criterion in that it asks about the arrest's effect on the subject's stress level, functionality, sleep problems, and energy levels.  Finally, the responses to the Checklist probe the remaining DSM-IV PTSD criteria, namely, the duration of the symptoms and resulting impairment.  The Court is persuaded that the questions Wallis devised for the Checklist were properly directed to pertinent the DSM-IV's PTSD criteria.  It is noted that the Checklist questions are leading in many respects.  But, that fact is not grounds for striking the Checklist or disallowing the experts' reliance on it.  Rather, Defendant may cross-examine Plaintiffs' Experts on the form of the questions and may argue their suggestive nature undermines the credibility of the responses.

Wallis and Manning reviewed a Plaintiff's responses to the Checklist and the background factual information in the Fulbright Summary before interviewing that Plaintiff. Each Plaintiff then met with and was personally interviewed by Wallis or Manning for forty-five to sixty minutes.  Armed with responses to the Checklist and the Fulbright Summary,

Plaintiffs' Experts then took personal histories of each Plaintiff.[11]   They compared for consistency the interview responses to the written information on each Plaintiff.  They also interviewed each Plaintiff about life and psychological experiences that might support or eliminate a PTSD diagnosis under the DSM-IV standard.  Based on the interviews, the application of the DSM-IV, and their extensive experience with anxiety disorders, Plaintiffs' Experts finalized their diagnoses.

Based on the available record, the Court holds that Plaintiffs' Experts' methods are logical and sufficiently reliable to support admissibility of the experts' diagnoses.  Plaintiffs' Experts' methods as presented in the record, although not ideal, are consistent with generally accepted psychotherapy practices.  *See Skidmore*, 188 F.3d at 618 (affirming district court's admission of expert's PTSD diagnosis where expert "testified to his experience, to the criteria by which he diagnosed [patient], and to standard methods of diagnosis in his field" and there was no indication expert utilized "junk science" prohibited by *Daubert*); *see also Reed v. City of Greenwood*, No. 402-CV-287PB, 2006 WL 644884, at *1 (N.D. Miss. Mar. 9, 2006) ("Review of Dr. Manning's deposition testimony in its entirety demonstrates not only an ample factual basis for his opinion testimony [diagnosing PTSD], but also that the data (patient history) and diagnostic tool (DSM4) utilized by Dr. Manning were appropriate for his field of expertise.").[12]

---

[11]     Wallis Deposition, at 102; Manning Deposition, at 93, 113, 115.

[12]     Furthermore, the Court notes that the methodology used by Plaintiffs' Experts address the concerns set forth in its August Order.  The Court expressed concerns about the conclusions

Neither Defendant nor Plaintiffs tie their arguments to the *Daubert* four-factor test for evaluating scientific conclusions.[13]  Both sides agree, however, consistent with reported decisions on expert testimony regarding PTSD diagnoses, that consideration of patient symptoms in light of DSM-IV criteria is required.  The Court therefore focuses its inquiry on Plaintiffs' Experts' steps to obtain pertinent information about each Plaintiff relating to the DSM-IV factors in order to determine the reliability of the experts' opinions.  This flexible approach is appropriate when considering the admissibility of a mental disorder diagnosis, which relies more heavily on a psychological expert's professional judgment than diagnoses of more tangible physical illnesses, such as broken bones.  *See* Christopher Slobogin, *Doubts About Daubert: Psychiatrict Anecdata as a Case Study*, 57 WASH. & LEE L. REV. 919, 920 (2000) (noting that, with regard to mental defect diagnoses, "mental health professionals involved in everyday practice may disagree more than half the time") (citing

---

in Wallis' report and noted that it was unable to determine from the existing record whether Wallis "followed a proper methodology in making her diagnoses." August Order, at 8.  The Court further instructed:  "It is necessary for Wallis to personally interview a plaintiff in order to render a diagnosis on that person.  She must examine the experiences of each plaintiff individually concerning the events in question, and must also consider each plaintiff's psychological history (as related to her by the plaintiffs) and their significant life experiences unrelated to the incidents in issue." *Id.*

[13]   The four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *Watkins*, 121 F.3d at 989 (citing *Daubert*, 509 U.S. at 593–94).   There appears to be no dispute in the field of psychology that a qualified diagnostician must interview the subject to determine the person's current mental state and inquire into the events that may have precipitated the current symptoms.

Samuel Fennig, *Comparison of Facility and Research Diagnoses in First-Admission Psychotic Patients*, 151 AM. J. PSYCHIATRY 1423, 1426 (1994) (showing 57.1% agreement on schizophrenia); Paul B. Lieberman & Frances M. Baker, *The Reliability of Psychiatric Diagnosis in the Emergency Room*, 36 HOSP. & COMMUNITY PSYCHIATRY 291, 292 (1985) (showing 41% agreement on schizophrenia, 50% agreement on mood disorders, and 37% agreement on organic brain syndromes)).

The Court now addresses each of Defendant's specific challenges to Plaintiffs' Experts' methodology and the information the experts used to make the diagnoses in issue. Defendant first attacks Plaintiffs' Experts' reliance upon the Fulbright Summary for each Plaintiff.  Each Fulbright Summary was prepared by Fulbright, an employee of Plaintiffs' attorney, Olney Wallis, and contained objective background information about a Plaintiff, that Plaintiff's own written account of the raid in which he or she was involved, and Fulbright's summary of that Plaintiff's oral account.  Defendant contends that the reports generated by Fulbright were unreliable which therefore renders the experts' diagnoses unreliable.  In support of its position, Defendant cites *Slaughter v. Southern Talc*, 919 F.2d 304 (5th Cir. 1990), *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005), and *In re Swine Flu*, 508 F. Supp. 897 (D.C. Col. 1981).  These cases are inapposite.  In *Slaughter*, the Fifth Circuit found that the district court properly excluded medical diagnoses based on reports that "were replete with so many obvious errors as to be of no value to the trier of fact."  919 F.2d at 307 (quotation omitted).  However, the court cautioned that typically such "questions regarding the scientific bases of an expert's opinion 'affect the

weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *Id.* at 306 (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  Unlike *Slaughter*, defendant has not shown any Fulbright Summary has factual errors, let alone being "replete" with "obvious errors."  *See id.* at 307.

The *In re Silica* court criticized as unreliable a silicosis diagnoses based on occupational exposure histories taken by a person without any medical training.  398 F. Supp. 2d at 622–23.  However, that court specifically approved an approach where a physician's nurse took the initial occupational exposure history and the physician later reviewed the history with his patient, making any needed corrections.  *See id.* at 623–24. Plaintiffs' Experts' approach is similar; the persons ultimately taking the definitive histories, Plaintiffs' Experts, did so in individual interviews of Plaintiffs.

The *In re Swine Flu* decision is also materially distinguishable.  There, the district court disallowed the testimony of a plaintiff's causation expert.  In formulating his opinion that plaintiff's Guillian-Barre Syndrome ("GBS") was caused by a swine flu vaccination, the doctor had relied on two documents.  One, compiled by plaintiff's attorney, was a summary of all GBS cases treated in Colorado hospitals from October 1976 until August 1977.  The other document was also a report of GBS cases in Colorado during the same time period, but relied instead on data retrieved from a computer database.  This database listed diseases other than GBS, which the court noted is extremely difficult to diagnose.  The plaintiffs relied on medical clerks who determined which of the reported diseases were GBS.  *In re Swine Flu*, 508 F. Supp. at 903.  The doctor expert admitted that he neither reviewed the records to

determine the reliability of the medical clerks' assessments, nor personally considered if the reported cases were actually GBS.  The court excluded the doctor's testimony because the underlying data was "based upon hearsay evidence not reasonably relied upon by experts in neurology and epidemiology" and was "of a rudimentary nature."  *Id*. at 904.  In contrast, Fulbright did not diagnose any Plaintiff's condition.  She merely compiled background information and summarized each Plaintiff's own account of his or her involvement in one of the August 2002 raids.  Further, unlike the doctor in *In re Swine Flu*, Wallis and Manning personally examined Plaintiffs.  In sum, there is no evidence whatsoever that the Fulbright Summary is inaccurate or unreliable, and no evidence that a person other than an expert in psychology made any diagnosis of any Plaintiff in this case.  Defendant's reliance on the cited authorities is misplaced.

Defendant also attacks Plaintiffs' Experts' conclusions on the ground that these experts made preliminary diagnoses before personally seeing Plaintiffs.  The preliminary diagnoses are not the issue here.  The focus is the final diagnoses in Wallis' and Manning's Amended Reports, which are based on the Fulbright Summary, the Checklist responses, and one-on-one interviews with Plaintiffs.[14]

Defendant also contends that Plaintiffs' Experts failed to consider events subsequent to the August 2002 raids that might have caused PTSD.  This argument is not supported by

---

[14]     It is noted that the preliminary diagnoses were based in part on the Plaintiffs' responses to the Checklist.  As discussed above, one section of the Checklist was designed by Wallis to probe DSM-IV criteria for diagnosing PTSD.

the record.  Wallis testified that she personally inquired of Plaintiffs whether they had suffered any traumatic events after the raids.[15]  Manning testified that she asked Plaintiffs about any changes in their lives since the raids.[16]  The Checklist contained twenty questions preceded by the limitation (in all caps and bold): **"FROM THE DATE OF THE ARREST AND BECAUSE OF THE ARREST**."  To the extent Plaintiffs' Experts failed to provide a more in-depth analysis of other potential causes, such failure goes to the weight, not admissibility, of the evidence.  Defendant will have the opportunity at trial to cross-examine Plaintiffs' Experts on their consideration of alternate causes.

Defendant next objects to the use of the Checklist, because it was devised in part by an economist (Dr. Lehrer) and it presupposes there were no other traumatic events.  Defendant misses the mark.  Wallis, not Dr. Lehrer, developed the questions in the Checklist pertinent to a PTSD diagnosis.  Further, as noted above, Wallis and Manning testified that they considered other events as possible causes for the PTSD diagnoses.

Next, Defendant contends that Plaintiffs' Experts should have used a standardized diagnostic scale such as the Clinician-Administered PTSD Scale for DSM-IV,[17] the PLC-C Scale,[18] or the Mississippi Civilian Event Scale.[19]  While it is true Wallis acknowledged that

---

[15]     Wallis Deposition, at 27–28, 41.

[16]     Manning Deposition, at 40.

[17]     Exhibit 13 to Wallis Deposition, contained in Appendix V to Wallis Motion.

[18]     Exhibit 14 to Wallis Deposition, contained in Appendix V to Wallis Motion.

[19]     Exhibit 15 to Wallis Deposition, contained in Appendix V to Wallis Motion.

these diagnostic tools are helpful tools in diagnosing patients,[20] she also testified that the questions she devised for the Checklist were comparable to those diagnostic tools.[21]  More importantly, Plaintiffs' Experts explicitly relied on the criteria set forth in the DSM-IV, which indisputably contains well-recognized criteria for diagnosing PTSD.  The Checklist asked questions specifically directed to the DSM-IV criteria for diagnosing PTSD.  The fact that other diagnostic methods are feasible or accepted does not undermine the acceptability of the methods used by Plaintiffs' Experts.

Defendant also argues the diagnoses are unreliable because Plaintiffs' Experts did not document a differential diagnosis analysis.  "Differential diagnosis is defined for physicians as 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'"  *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) (quoting STEDMAN'S MEDICAL DICTIONARY 428 (25th ed. 1990)).  Although Plaintiffs' Experts did not list the excluded diagnoses, both testified that they performed a differential diagnosis analysis on the Plaintiffs.[22]  There is no evidence or authority that suggests diagnosticians must record excluded diagnoses.  Thus, this argument by Defendant is rejected.

---

[20]    Wallis Deposition, at 55–56.

[21]    Wallis Deposition, at 59–60; *see also* Affidavit of Linda Wallis, Exhibit B to Plaintiffs' Response, ¶ 3.

[22]    Wallis Deposition, 27–28, 64–68, 108; Manning Deposition, 90–92.

The DSM-IV states malingering should be ruled out where financial remuneration is at stake.  DSM-IV, at 467.  Defendant maintains that Plaintiffs' Experts did no blood work on any Plaintiff to determine whether certain hormones were present that might rule out malingering.  The issues presented are whether Plaintiffs' Experts in fact ruled out malingering and whether they did so in a scientifically acceptable manner.  Wallis explained she did rule out malingering based on her experience through her interviews of Plaintiffs. She noted that notwithstanding this litigation, most of the Plaintiffs were reluctant to talk to her and downplayed the impact of the raids in their lives.[23]  Similarly, Manning states that she ruled out malingering as she listened to Plaintiffs' explanations of their experiences and observed their behavior.[24]  Wallis and Manning also compared each Plaintiff's interview responses to the Plaintiff's Fulbright Summary and Checklist responses to ensure that Plaintiff's accounts and symptoms were consistent.  The DSM-IV only requires that malingering be considered and ruled out.  Plaintiffs' Experts explain how they did so and their methodology is sufficient.  Defendant supplies insufficient persuasive evidence to the contrary.  Defendant relies on a report from the Internet website of the National Institute of Mental Health, research produced in discovery from Wallis' file.[25]  Defendant has offered

---

[23]   Wallis Deposition, at 25–26.

[24]   Manning Deposition, at 53–54.

[25]   "Reliving Trauma," http://www.nimh.nih.gov/publicat/reliving.cfm, Exhibit 11 to Wallis Motion.  Defendant apparently relies on the following statement in the report:

> People with PTSD tend to have abnormal levels of key hormones involved in response to stress.  When people are in danger, they produce high levels of

no expert or other admissible evidence that blood tests must or even should be used to rule

out malingering to make a valid diagnosis of PTSD.  Plaintiffs' Experts' decision not to order

Plaintiffs' blood tests as part of the diagnostic process has not been shown to be a material

deviation from accepted methodology for psychological evaluations for PTSD.  The absence

of blood tests bears on the weight of the experts' conclusions, not their admissibility.

---

> natural opiates, which can temporarily mask pain. Scientists have found that people with PTSD continue to produce those higher levels even after the danger has passed; this may lead to the blunted emotions associated with the condition.

*Id.* (citing R. Yehuda. "Psychoneuroendocrinology of Post-Traumatic Stress Disorder," *Psychiatric Clinics of North America*, Vol.21(2), 359-79 (1998), *Behavioral Neuroscience*, Vol. 117, No. 3, 505–516 (2003) (the "Yehuda article")).  The National Institute of Mental Health report also states, "Some studies have shown that cortisol levels are lower than normal and epinephrine and norepinephrine are higher than normal."  The Yehuda article primarily discusses "[c]ortisol elevations [being] one mechanism through which stress affects learning and memory.  Research, primarily in rats, has shown that mild glucocorticoid elevations enhance memory and extreme deficiencies or elevations disrupt memory."  Yehuda article, at 505.  That article states in pertinent part about cortisol and PTSD:

> This line of research will provide important data regarding processes involved in traumatic emotional memories.  It must be determined whether cortisol increases during traumatic events play a role in the formation of traumatic memories.  It may be the case that extreme elevations in cortisol are protective against too strong a memory trace.  This interpretation is consistent with data showing that inadequate cortisol elevations following trauma is predictive of [PTSD], which necessarily includes tenacious recollections or reexperiencing of the traumatic event.  Noradrenergic mechanisms are also implicated in PTSD.  Future research is needed to elucidate the role of both cortisol and noradrenergic mechanisms in traumatic memory.

*Id.* at 514 (citations to other articles by Yehuda omitted). Defendant has not shown that the cited articles posit a scientifically authoritative or generally accepted conclusion that a blood test for cortisol is an accepted means to determine the presence of the PTSD.  At best, these articles suggest that research is necessary and possibly underway to determine whether there is a meaningful connection between decreased cortisol levels and PTSD or traumatic memory.

Defendant next maintains that Wallis and Manning did not use sufficiently diverse sources of information, such as interviews of relatives or friends, to corroborate Plaintiffs' self-reported medical histories.  Defendant objects because Plaintiffs' Experts interviewed only one friend of, and fewer than ten family members related to, the fifty-two Plaintiffs that were diagnosed with PTSD or other psychological ailments.  The Court is unpersuaded by this argument.  Defendant has not shown instances in which a Plaintiff's self-reported history is so patently misleading as to make it unreasonable for an examining medical professional to place any reliance on it.  *See and compare Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 n.3 (7th Cir. 2000).  Indeed, there is no evidence that any Plaintiff misrepresented their medical histories, the events in issue, or their symptoms to Plaintiffs' Experts.  Thus, again, the experts' failure to interview more family members and friends before reaching the PTSD diagnoses is a matter for the jury to consider in determining the weight to give the Experts' opinions.

Finally, Defendant mounts a wholesale attack on the reliability of Plaintiffs' Experts' diagnoses claiming the diagnoses are merely litigation driven.  Defendant points out that Wallis is married to Plaintiffs' counsel, Olney Wallis, and that she therefore has a direct financial interest beyond her expert fee to exaggerate Plaintiffs' injuries.  While this bias may be present, it is not disqualifying. Wallis and Manning's opinions are not inadmissible merely because they examined Plaintiffs solely to make diagnoses for this case, and not for treatment.  Courts not infrequently admit testimony of medical experts who examined patients only for purposes of a litigation and who form an opinion for testimony, not

treatment.  *See, e.g., In re Silica*, 398 F. Supp. 2d at 622–23.  Defendant cites no support for the proposition that admissible expert testimony on medical diagnoses is limited to a plaintiff's treating physician or therapist.  Defendant will be free to cross examine Plaintiffs' Experts on these issues at trial.  Wallis' marital relationship with Plaintiffs' counsel and Manning and Wallis' alleged lack of independence are matters that may be judged at the trial; the relationships and potential bias go to the weight, not admissibility of these Experts' testimony.

## III.   <u>CONCLUSION AND ORDER</u>

To argue that Plaintiffs' Experts' diagnoses are inadmissible as unreliable, Defendant does not challenge the expertise of Plaintiffs' Experts Manning and Wallis.  Nor does Defendant challenge the use of the DSM-IV diagnostic criteria for PTSD.  Defendant's attacks focus upon alleged misapplications of the DSM-IV, such as the alleged failures to perform differential diagnoses for each Plaintiff, use a diagnostic scale, rule out other causes, and use blood tests to rule out malingering.  Defendant presents no expert testimony to support any of its contentions.  While certain of Defendant's challenges are quite substantial, they all are suitable for jury consideration at trial.  This Court, an evidentiary gatekeeper, may not assess the correctness or persuasiveness of Plaintiffs' Experts' opinions.  *See Moore*, 151 F.3d at 276.  Defendant's challenges are overruled.  It is therefore

**ORDERED** that Defendant City of Houston's Renewed Motion to Exclude the Opinions of Plaintiffs' Expert Linda Wallis [Doc. # 189] is **DENIED**.  It is further

**ORDERED** that Defendant City of Houston's Motion to Exclude the Opinions of Plaintiffs' Expert Marilyn Manning [Doc. # 196] is **DENIED**.

**SIGNED** at Houston, Texas, this **12th** day of **June, 2006**.

Nancy F. Atlas
United States District Judge