## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CORI LOPEZ, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-2297 |
| | § | |
| THE CITY OF HOUSTON, *et al.*, | § | |
| Defendants. | § | |

-------------------------------------------------

| | | |
|---|---|---|
| BRANDI RATLIFF, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-3809 |
| | § | |
| THE CITY OF HOUSTON, *et al.*, | § | |
| Defendants. | § | |

-------------------------------------------------

| | | |
|---|---|---|
| CHAD CORY, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0125 |
| | § | |
| THE CITY OF HOUSTON, *et al.*, | § | |
| Defendants. | § | |

-------------------------------------------------

| | | |
|---|---|---|
| ROLAND T. ROSS, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0126 |
| | § | |
| THE CITY OF HOUSTON, *et al.*, | § | (caption continues) |
| Defendants. | § | |

-------------------------------------------------

## MEMORANDUM AND ORDER

WILLIAM THOMAS GILMORE,          §
    Plaintiff,          §
       §
v.          §   CIVIL ACTION NO. H-04-1544
       §
THE CITY OF HOUSTON, *et al.*,          §
    Defendants.          §
--------------------------------------------------------

 SARAH SPONSEL,          §
    Plaintiff,          §
       §
v.          §   CIVIL ACTION NO. H-04-1542
       §
THE CITY OF HOUSTON, *et al.*,          §
    Defendants.          §
--------------------------------------------------------

EMILY DEMMLER,          §
    Plaintiff,          §
       §
v.          §   CIVIL ACTION NO. H-04-1543
       §
THE CITY OF HOUSTON, *et al.*,          §
    Defendants.          §
--------------------------------------------------------

LESLIE RICHIE,          §
    Plaintiff,          §
       §
v.          §   CIVIL ACTION NO. H-04-1545
       §
THE CITY OF HOUSTON, *et al.*,          §
    Defendants.          §
--------------------------------------------------------

 EDGAR COELLO, *et al.*,          §
    Plaintiffs,          §
       §
v.          §   CIVIL ACTION NO. H-04-3221
THE CITY OF HOUSTON, *et al.*,          §
    Defendants.          §
--------------------------------------------------------

## TABLE OF CONTENTS

I.      **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        A.      **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
        B.      **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
II.     **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . . **14**
III.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
        A.      **Evidence of a Custom** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
                1.      **Conduct Between 1989 and 2002** . . . . . . . . . . . . . . . . . . . . **18**
                2.      **Conduct During 2002** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
        B.      **City Policymaker's Actual or Constructive Knowledge of**
                **the Custom** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
        C.      **Moving Force Behind Deprivation of Plaintiffs'**
                **Constitutional Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**
IV.     **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

In this civil rights dispute arising from the August 2002 arrests of Plaintiffs,[1]

Defendant City of Houston ("Defendant" or "the City") filed a Motion for Summary

Judgment [Doc. # 216 in *Lopez*, H-03-2297] ("MSJ"), the *Lopez* Plaintiffs responded

[Doc. # 221 in *Lopez*, H-03-2297] ("Response"), and Defendant replied [Doc. # 225

in *Lopez*, H-03-2297].   On January 7, 2008, after this initial round of briefing, the

Court held oral argument; after argument, at the direction of the Court, the parties

filed supplemental briefing.[2]   Having considered the parties' submissions, the

_____

[1]     The Court's reference to "Plaintiffs" includes the plaintiffs in all nine cases listed in this
        Order's caption.  Some Plaintiffs were arrested on August 16, 2002, and others were arrested
        on August 17, 2002.

[2]     *See* Plaintiffs' Supplement to Their Response to Defendant the City of Houston's Motion for
        Summary Judgment [Doc. # 232 in *Lopez*, H-03-2297]; Plaintiffs' Supplemental Response
        to Defendant City of Houston's Motion for Summary Judgment [Doc. # 183 in *Cory*, H-03-
        0125]; City of Houston's Reply to Plaintiffs' Supplemental Response to the City['s] Motion
        (continued...)

applicable legal authorities, and all matters of record, the Court concludes that the City's motion should be **denied**.

I.    <u>BACKGROUND</u>

A.    <u>Procedural Background</u>

Previously, in December 2004, the City, together with Defendant former City Police Chief C.O. Bradford, filed a motion for summary judgment [Doc. # 134 in *Lopez*, H-03-2297], which the Court granted in part and denied in part. *See* Memorandum and Order, entered July 25, 2005 [Doc. # 166 in *Lopez*, H-03-2297] ("2005 M&O"). The Court held that Plaintiffs could proceed against the City and Chief Bradford on three claims: (1) a § 1983 claim based on the facially unconstitutional Jackson Plan, (2) a § 1983 claim based on an alleged custom of mass detention without reasonable suspicion, and (3) the claim that Bradford failed to supervise his staff so as to prevent Plaintiffs' unlawful detention. 2005 M&O, at 78.[3]

The City's current summary judgment motion is relevant only to the second claim listed above, *i.e.*, the custom of mass detention without individualized reasonable suspicion. At oral argument, the Court focused upon the pending motion

---

[2]    (...continued)
for Summary Judgment [Doc. # 223 in *Lopez*, H-03-2297].

[3]    After this Court's 2005 M&O, Defendant Bradford filed an appeal [Doc. # 170 in *Lopez*, H-03-2297], which was dismissed for lack of jurisdiction on July 11, 2007 [Doc. # 211 in *Lopez*, H-03-2297]. This Court then ordered parties to mediation and gave permission for Defendants to file motions for summary judgment. Minute Entry Order, August 22, 2007 [Doc. # 214 in *Lopez*, H-03-2297].

and, therefore, the custom issue.  Since the January 2007 argument, Plaintiffs have expressed some concern[4] about implications by the Court that Plaintiffs' only viable claim against the City stems from their argument regarding custom.  Contrary to any implications at oral argument, the Court recognizes that  Plaintiffs' theory regarding official policy is a live claim.[5]

### B.    Factual Background

The relevant facts are set out in the 2005 M&O.  These facts will be recapped only briefly here, viewed in the light most favorable to Plaintiffs.  The Court also describes evidence of record pertinent to the issue of custom and practice.

In the summer of 2002, the Houston Police Department ("HPD") issued and implemented a series of plans to address illegal street racing.  Street racing had been identified as a problem by officials at the highest levels of HPD, because of concerns for public safety during the events and because there were  rashes of auto parts thefts, apparently to replace parts damaged during racing.  Over the summer, plans were drafted by HPD Captain Mark Aguirre, Captain S.A. Smith, and Lieutenant F.S. Jackson with strategies for addressing the street racing problem.  Chief Bradford was

---

[4]    *See* Motion to Allow Extended Length of Supplemental Response to Defendant City of Houston's Second Motion for Summary Judgment Combined with Request for Reconsideration Excluding Claims of Unconstitutional Arrest [Doc. # 185 in *Cory*, H-03-0125] .

[5]    *See* 2005 M&O, at 78; *Cory* Plaintiffs' Fourth Amended Complaint [Doc. # 67 in *Cory*, H-03-0125].

aware of at least some of the street racing strategies and operations, although the parties dispute whether he was aware of the events planned for August 16 and 17, 2002.

Plaintiffs claim they were injured by Operation ERACER, an HPD operation targeting street racing, on the weekend of August 16 and 17, 2002.[6]  Some Plaintiffs were arrested on Friday, August 16, when HPD officers conducted a surprise raid on the parking lot of the James Coney Island restaurant at 5700 Westheimer.  Others were arrested on Saturday, August 17, when HPD conducted another surprise raid at the parking lot of a K-Mart store and Sonic Drive-In restaurant, both located at the 8400 block of Westheimer.  On both occasions, HPD officers swept in and detained everyone in the parking lot, including customers of the open businesses.  According to a post-operational memo sent to Assistant Chief McClelland, HPD arrested 37 people at James Coney Island on August 16.  Of these, 31 were arrested for Class C

---

[6]     The record is unclear regarding the dates for HPD's operation.  Although it appears that the operation occurred over only two nights (Friday, August 16 at James Coney Island, and Saturday, August 17 at Sonic and K-Mart), the parties' pleadings and arguments have also referred, without citation, to a raid at Sonic and K-Mart on Sunday, August 18.  The reference to August 18 may be simply because the August 17 operation extended past midnight, into the early hours of August 18.  A post-operational memo drafted on Monday, August 19, refers only to August 16 (James Coney Island) and 17 (K-Mart).  *See* Exhibit K to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].

The Court assumes that the events in question occurred only on August 16 and 17, 2002, with the understanding that the HPD operation on August 17 continued into the morning of August 18.  If the Court's assumption is inaccurate, the parties are instructed to inform the Court immediately, and to direct the Court to documentation of any additional operations.

Trespass (remaining),[7] one for a SETSIC warrant, and five for municipal warrants.[8]

At K-Mart on August 17, HPD arrested 285 people: 228 for Class C Trespass

(remaining), 54 for juvenile curfew, one for possession of marijuana, and two for

public intoxication.[9]   Notably, none of these arrests were for street racing or moving

violations.[10]   Plaintiffs allege that hundreds of persons were detained by HPD

without individualized reasonable suspicion of criminal activity.

Plaintiffs argue that Operation ERACER on August 16 and 17 was part of a

custom within HPD of mass detentions without individualized reasonable suspicion.

They direct the Court's attention to other HPD operations, dating as far back as 1989,

arguing that these plans establish a pattern of similar constitutional deprivations by

HPD.  The chronology and relevant features of the plans are as follows:

---

[7]     The City's supplemental briefing identifies Section 30.05 of the Texas Penal Code as the relevant trespass statute, while conceding that Plaintiffs' arrests had no basis in law because HPD failed to give Plaintiffs an opportunity to depart.  *See* City's Supplemental Brief [Doc. # 233 in *Lopez*, H-03-2297], at 3-4; *id*. Exhibit 2 (version of Tex. Pen. Code § 30.05 that was in effect in 2002 states that a person commits criminal trespass if he or she enters or remains on property without effective consent and "(1) had notice that the entry was forbidden; or "(2) received notice to depart but failed to do so").  Although not cited by the parties, a City ordinance also forbids trespass.  *See* HOUSTON, TEX. CODE § 28-24 ("It shall be unlawful for any person to be found on the premises of another in the nighttime, under suspicious circumstances.").

[8]     *See* Memorandum dated August 19, 2002, from Lt. Jackson to Assistant Chief McClelland, regarding "Category of Arrests, Operation ERACER, Week One" (Exhibit K to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]).

[9]     *Id*.

[10]    *But see id*. (one arrest for Road Rage Class A Assault at 8500 Westheimer, the K-Mart location, on the night of the James Coney Island raid at 5700 Westheimer).

- **Stella Link (1989)**:[11] To address drug sales and blight in the Link Valley Apartments, HPD executed a four-hour sweep of the Link Valley apartment complex, during which the six-block area was closed to non-residents.  The planned action was announced ahead of time; HPD informed residents of the planned drug sweep and warned trespassers to leave.  HPD also obtained authority from property owners to file criminal trespassing violations.  For 30 days after the sweep, barriers were in place at all but two entrances to the apartment complex, and HPD checkpoints were erected at the two open entrances.  Residents were issued passes so that they could pass through the checkpoints without being stopped. Officers posted at the checkpoints were instructed to "provide information only to persons entering or exiting Link Valley" and "not to force anyone to stop."  City marshals were available to check licenses and traffic warrants and to make arrests, if required.

- **Gulfton (May 4 - June 9, 1990)**:[12]  Motivated by a high incidence of drug crimes, gun crimes, and burglary, HPD implemented a strategy of intense police saturation and undercover narcotics enforcement in the Gulfton Area (a one-and-a-half square mile area in southwest Houston).  Officers saturated the area for three days, then maintained an increased presence for six days, and a lesser presence for 21 days. Managers of area apartment complexes signed affidavits allowing arrest of trespassers on apartment property.   Arrests were made, based on suspicion, including 1,394 unspecified "crime arrests," 5,215 traffic citations, and 93 drug arrests.  The plan mentions previous, apparently ineffective, use of "zero tolerance" squads.  The plan does not mention any checkpoints, sweeps, or containment strategies.

- **Richmond Strip (December 1995)**:[13] HPD implemented the Richmond Strip operation to improve traffic flow on Richmond Avenue and reduce "cruising" and criminal conduct, including gang activity.  Officers managed traffic by prohibiting U-turns and other turns at specific intersections, and by manual control of traffic signals.  They also strictly enforced laws regarding juvenile curfew, DWI, and traffic violations.  HPD gang units and DWI task force officers enforced laws on all observed violations.  The operation resulted in 545 arrests, including 110  for Class C offenses, 20 for misdemeanors, eleven

---

[11]     *See* Exhibit 2 to MSJ.

[12]     *See* Exhibit 3 to MSJ.

[13]     *See* Exhibit 4 to MSJ.

for DWI, two for felonies, 68 for curfew violations, and 334 for traffic violations.   The plan does not mention any checkpoints, sweeps, or containment strategies, and states, "All efforts should be made to accommodate business patrons and local residents."

• **Operation Renaissance (1999-2000)**:[14]   In cooperation with community groups in the South Central area of Houston, HPD sought to address drug activity and other offenses such as drunkenness, aggressive panhandling, dumping, trespass, urinating, and littering.   HPD's strategy involved high police visibility, quicker response times, and "zero tolerance" enforcement against open-air drug dealing, resulting in a high number of arrests.  The plan does not mention any sweeps or mass detentions.   Although the *Lopez* Plaintiffs' Second Amended Complaint states that the operation included "roundups" and mass arrests at the downtown Greyhound Station and under the Pierce Elevated,[15] Plaintiffs have submitted no evidence supporting this allegation.

• **STAARS Meeting (April 18, 2002)**:[16] Chief Bradford, Captain Aguirre, and other HPD personnel attended a meeting on April 18, 2002, at which illegal street racing was discussed.   A memorandum from HPD Internal Affairs indicates that Captain J.P. Mowka informed Chief Bradford that a plan was being developed to deal with illegal street racing.   The memorandum also indicates that, at the meeting, Captain Aguirre suggested addressing street racing by "implementing Zero Tolerance tactics, mass arrests, and towing vehicles," and that Chief Bradford "praised the recommendation."[17] Although Captain Aguirre's statement to Internal Affairs mentions arresting "everyone there," it also states that, at the STAARS meeting, Aguirre did not specifically mention arresting spectators for Class C trespass.[18]

---

[14]     *See* Exhibit 5 to MSJ.

[15]     *See* Second Amended Complaint [Doc. # 119 in *Lopez*, H-03-2297], ¶¶ 15-16.

[16]     *See* Exhibit 1 to Response.  This exhibit is sealed, but the Court refers only to matters cited publicly in the parties' briefing.

[17]     *Id*. at 221.

[18]     *Id*. at 228.

- **Aguirre Plan (May 13, 2002)**:[19] Captain Aguirre's plan to combat street racing, entitled Operation ERACER, was submitted to Chief Bradford, Assistant Chief McClelland, and Executive Assistant Chief Breshears.  The plan states that issuing citations for traffic violations has been ineffective in combating street racing, and instead recommends a "zero tolerance" strategy of arresting all observed violators of local, state, or federal laws, and towing their vehicles.  (This strategy involved a waiver of department policy regarding citations for certain lesser offenses, thus resulting in more arrests.)   The Aguirre Plan lists eight known street racing locations, including the 5700 and 8400 blocks of Westheimer (the locations of the events at issue in this case), and requests six prisoner vans and a helicopter.  It does not call for mass detentions or containment.

  The Aguirre Plan was rejected by Assistant Chief McClelland because he disagreed with Aguirre's recommendations to (1) notify violators' insurance companies and (2) recruit federal assistance under the Clean Air Act;[20] it was also rejected by Executive Assistant Chief Breshears because it did not include undercover surveillance as a strategy to identify current racing locations.[21]

- **Smith Plan (May 30, 2002; implemented June 2002)**:[22] Captain Smith proposed the Smith Plan, addressed to Executive Assistant Chief Breshears, to

---

[19]     *See* Exhibit 2 to Response.

[20]     *See* Memorandum from McClelland to Chief Bradford and Executive Assistant Chief Breshears, dated May 23, 2002 (Exhibit 3 to Response).

[21]     *See* Breshears Deposition (Exhibit 10 to Response), at 82-83.  Plaintiffs note that HPD officials did not reject the Aguirre Plan based on its "zero tolerance" tactics, arguing strenuously that the failure of "zero tolerance" to raise eyebrows among high-ranking officials indicates that the strategy was an established custom within HPD.  The Court notes, however, that although the Aguirre Plan uses the term "zero tolerance," it does *not* discuss mass containment of the public or mass detention without individualized reasonable suspicion or arrests without probable cause.  As discussed in Section III.A.1, *infra*, focusing on the term "zero tolerance" distracts attention from the real issue before the Court, that is, the existence of a custom of mass detention without individualized reasonable suspicion.  The term "zero tolerance" is ambiguous enough to refer to both lawful and unlawful police activity.

[22]     *See* Exhibit 4 to Response.

combat street racing.[23]   The plan called for two phases: Phase One, a covert operation over three weekends, would use undercover officers to infiltrate racing locations to document illegal activity and identify racers and locations; Phase Two, an overt operation over the following two weekends, would use "arrest teams" to conduct "zero tolerance sweeps" through identified racing locations and strictly enforce all violations of federal, state, and local laws. Warrants, based on intelligence gathered during Phase One, would be executed during Phase Two.   The Smith Plan lists eleven known racing locations, including the 5700 and 8400 blocks of Westheimer. Like the Aguirre Plan, the Smith Plan does not mention mass detentions or containment.

- **Smith Update (June 14, 2002)**:[24]   Captain Smith authored a second memorandum, addressed to Chief Bradford, updating Bradford on the Smith Plan's covert operations in the first half of June.   The update memorandum reports undercover investigation of multiple locations, including the 5700 and 8400 blocks of Westheimer, and anticipates beginning the overt operation on June 15.  It states that officers will issue citations or make arrests for traffic violations.    This memorandum does not mention mass detentions or containment.  Rather, it indicates preparation for a large number of arrests and tows, stating that the Juvenile Division (a detention facility) "has been notified of a possible influx of many prisoners for underage drinking and curfew violations," that HPD wreckers "have been advised of a possible large number of vehicles to be towed," and that helicopter assistance had been requested.

- **Smith Evaluation (July 2, 2002)**:[25] In a memorandum to Executive Assistant Chief Breshears, Captain Smith reported on implementation of the Smith Plan. On June 15, HPD conducted an operation at 7100 Business Park Drive, apparently the parking lot of a closed business.[26] The memo states that officers

---

[23]   This Court has previously held that Chief Bradford approved the Smith Plan, and that the Smith Plan is facially constitutional.  2005 M&O, at 26-27.

[24]   *See* Exhibit 5 to Response. The final paragraph of the Smith Update states that it "was prepared quickly to provide an update to the street racing project," and that it "should not be considered a comprehensive, organized, official correspondence in reference to this operation."

[25]   *See* Exhibit 6 to Response.

[26]   *See* City of Houston's Reply to Plaintiffs' Supplemental Response to the City Motion for
(continued...)

in marked units converged on every exit "[w]ithin one minute," containing "in excess of [350] vehicles"; that officers then established a single exit and interviewed the occupants of every vehicle present at the location; that helicopter surveillance indicated that no more than eight vehicles escaped; and that officers issued 84 arrests or citations for reckless driving, traffic violations, juvenile curfew violations, and "class C violations."  On June 22, officers returned to 7100 Business Park and found the location deserted.

Implementation of the Smith Plan also focused on locations on Westheimer. On both June 15 and June 22, uniformed personnel made arrests and issued citations on Westheimer based on observed violations.  The memorandum mentions no containment or mass detentions on Westheimer, but concludes with a recommendation that "the racing and related incidents occurring on Westheimer must be addressed," and that the "Westheimer situation can only be controlled with saturated and deliberate zero tolerance patrol and traffic enforcement tactics."

•   **Jackson Plan (August 1, 2002; planned implementation August 16 and 17, 2002)**:[27] The Jackson Plan states that Operation ERACER, proposed by Captain Aguirre, has now been approved by Assistant Chief McClelland.[28]  It lists eleven racing locations, including the 5700 and 8400 blocks of Westheimer, and states that the night's target location will be selected after surveillance by unmarked units.  The plan calls for containment, instructing units to "move on the location simultaneously" and block or close "[a]ll exits."  The plan states, "Those choosing to evade the containment by driving over, around, or through barricades will be dealt with by use of stingers and traffic enforcement units."  It further instructs officers to inspect and scrutinize all contained vehicles, and to "document each and every person they have

---

[26]   (...continued)
Summary Judgment [Doc. # 223 in *Lopez*, H-03-2297], at 5.

[27]   *See* Exhibit 7 to Response.  The Jackson Plan was addressed to officers and supervisors, rather than high-ranking officials, although in the text it states that the operation had been approved by Assistant Chief McClelland.

[28]   *See also* Exhibit D to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125] (memorandum from Assistant Chief McClelland, dated August 12, 2002, states that he has approved Operation ERACER as detailed in the Jackson Plan).  The 2005 M&O, at 27-28, held that the Jackson Plan is facially unconstitutional and that a genuine fact issue exists as to Chief Bradford's approval of the plan.

encountered." Drivers may be checked for license and insurance, and vehicles checked for registration and inspection sticker. The plan anticipates arrests of racers and other violators. The attached Equipment and Personnel List requests, among other things, six prisoner vans, 100 flex cuffs, and complaint forms for traffic, beverage consumption, noise, "general," and trespass.

• **Aguirre Memorandum (August 13, 2002; planned implementation beginning August 16, 2002):**[29] Captain Aguirre sent a memorandum, dated August 13, 2002, to Assistant Chiefs Breshears and McClelland, among others, entitled "Anticipated Mass Arrests from Operation ERACER." Aguirre states that the first phase of Operation ERACER will be conducted on August 16, targeting street racers "and their followers." He further states, "we anticipate that the operation will produce mass arrest from the onset."

• **Operation ERACER Task Force Meeting (August 15, 2002):**[30] Assistant Chief McClelland convened a "mandatory planning meeting" for all members of the Operation ERACER task force. HPD's Internal Affairs Division collected statements from some officers present at the meeting, which recount officers' recollections that they were instructed to detain racing spectators along with racers, that they were to use trespass as an enforcement tool, that trespass signs were shown to the officers at the meeting, and that Chief Bradford's support for Operation ERACER was communicated to them.[31]

• **Operation ERACER Game Plan (August 16, 2002):**[32] The Game Plan, which appears to be a detailed program to implement the Jackson Plan, does not identify its author or recipients. Like the Jackson Plan, the Game Plan gives instructions to sweep in and contain all persons at the target location. (Several potential locations are identified, including the 5700 block of Westheimer. The 8400 block of Westheimer is not identified, although the 8500 block is.) The plan states that an Arrest Team will establish order in the containment

---

[29]   *See* Exhibit C to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].

[30]   *See* Exhibit D to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].

[31]   *See* Counsel's Summary of Officers' Statements and Statements of Sgt. Cain, Sgt. Roberts, Sgt. Zitzmann, Officer McClellan, and Sgt. Maeker (Exhibits A, A-I, A-II, A-III, A-IV, & A-V to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]).

[32]   *See* Exhibit 8 to Response.

area, using a public address system to instruct persons to remain calm and not to flee, and warning that those attempting to flee will be arrested.  The plan anticipates implementation at open businesses, stating that an exit should be established "to funnel the legitimate patrons of the open business off the parking lot." Undercover officers are instructed to point out to the arrest team the "observed violators."  The plan further states:

> Make no mistake in the intent of the project; this is a Zero Tolerance operation.  Trespass Affidavits have been obtained for each location described and the no trespass signs have been posted.  The majority of the arrests will be for the city ordinance of trespass remaining, which is a Class C Misdemeanor.  We will charge for each violation discovered in the process.

The Game Plan identifies no bases for arrests, other than "trespass remaining" and attempts to flee.

In summary, Plaintiffs' evidence shows two, or arguably three, incidents of mass detentions over a two-month period: on June 15, 2002, and again on August 16 and 17, 2002.  Plaintiffs' evidence also shows that, beginning in April 2002, HPD was focused on illegal street racing and was actively developing strategies to shut the racing down.  Chief Bradford was aware of at least some of the anti-racing initiatives. HPD committed a large number of officers and significant resources to its anti-racing operations throughout the summer of 2002 and carefully planned, in advance, the implementation of Operation ERACER on August 16 and 17, 2002.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support

of the motion, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the burden of demonstrating that there is no evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *de la O v. Housing Auth.*, 417 F.3d 495, 501 (5th Cir. 2005). If the moving party meets this initial burden, the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue for trial. Rule 56(e). *Id.* The court construes all facts and considers all evidence in the light most favorable to the nonmoving party. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 416 (5th Cir. 2006).

## III.   ANALYSIS

In the Fifth Circuit, in accordance with *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978), municipal liability under 42 U.S.C. § 1983 requires proof of three elements: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002), *cert. denied*, 537 U.S. 1110 (2003); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), *cert. denied*, 534 U.S. 820 (2001). A municipality cannot be held liable solely because it employs a tortfeasor. In other words, a municipality cannot be held liable under § 1983 on a

*respondeat superior* theory.  *Monell*, 436 U.S. at 691.

The pending motion addresses only Plaintiffs' theory regarding an alleged custom of HPD, not their argument regarding an official, formal, written policy. Therefore, under *Monell*'s first element, Plaintiffs must show a "persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

Under *Monell*'s second element, Plaintiffs must show "[a]ctual or constructive knowledge of [the] custom" that is "attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Pineda*, 291 F.3d at 238; *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc), *cert. denied*, 472 U.S. 1016 (1985).  Actual knowledge can be shown "by such means as discussions at council meetings or receipt of written information." *Pineda*, 291 F.3d at 330.  Constructive knowledge of a municipal custom requires a showing that the governing body "would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id*.

Under *Monell*'s third element, to establish that the custom is the "moving

force" behind the constitutional violation, Plaintiffs must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997); *see Pineda*, 291 F.3d at 328.[33]

On each of the three elements, as discussed below, Plaintiffs have demonstrated a genuine issue of material fact sufficient to defeat summary judgment. However, the Court holds that Plaintiffs have not demonstrated that the custom of mass detentions without individualized reasonable suspicion preceded 2002. All pre-2002 plans and operations are irrelevant to the issue of whether there was an HPD custom.

## A.    <u>Evidence of a Custom</u>

To satisfy the first element under *Monell*, Plaintiffs must establish a "persistent, widespread practice of city officials or employees" that is "so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett*, 735 F.2d at 862. For the reasons stated below, the Court holds that Plaintiffs have not established a genuine issue of material fact regarding existence of a custom from 1989 through 2002, but that the record reveals a fact issue regarding existence

---

[33]    When a court concludes that a municipal policy or custom itself violates federal law, that conclusion "also determine[s] that the municipal action was the moving force behind the injury of which plaintiff complains." *Brown*, 520 U.S. at 405. However, in cases in which the policy or custom at issue is facially constitutional, establishing the "moving force" element is more difficult, and requires a showing that the municipal action was taken "with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407 (quoting *Canton v. Harris*, 498 U.S. 378, 388 (1989)).

of a custom within the summer of 2002.

### 1.    Conduct Between 1989 and 2002

Plaintiffs argue that HPD's custom of mass detentions without reasonable suspicion has existed since 1989, citing to all the operations summarized in Section I.B, *supra*: Stella Link (1989), Gulfton (1990), Richmond Strip (1995), Operation Renaissance (1999-2000), the Aguirre Plan (May 13, 2002), the Smith Plan (May 30, 2002), the Smith Implementation (June 15, 2002), the Jackson Plan (August 1, 2002), and the Game Plan (August 16, 2002).  The Court holds that, although the operations prior to 2002 bear some similarities to Operation ERACER, Plaintiffs have not presented sufficient evidence of relevant similarities to demonstrate a genuine fact issue that all or, indeed, any of these operations, spanning thirteen years, constitute a single custom of unlawful police activity.

This case focuses on mass detention without individualized reasonable suspicion, as confirmed by Plaintiffs' most recent filings.[34]  Although each of the cited operations resulted in a large number of persons being detained or arrested, Plaintiffs have presented no evidence of mass detentions occurring before 2002.[35]

---

[34]    *See Lopez* Supplemental Response [Doc. # 232 in *Lopez*, H-03-2297], at 13; *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].  The Court notes that the *Cory/Ross* brief does not discuss any of the pre-2002 plans.

[35]    The *Lopez* Plaintiffs allege that Operation Renaissance, in 1999-2000, included sweeps and mass detentions, *see* Second Amended Complaint [Doc. # 119 in *Lopez*, H-03-2297], ¶¶ 15-16, but have offered no summary judgment evidence to support their assertion on this point.

The Stella Link operation involved *seriatim* detentions for those who sought to enter the Link Valley Apartments and did not have resident passes. The Gulfton and Richmond Strip operations involved individual arrests for observed unlawful activity. These operations are fundamentally different from the 2002 operations (June 15 and August 16 and 17), in which a large number of people were detained for lengthy periods of time based merely on their presence at a targeted location, and then subjected to individual scrutiny.

To be sure, there are some similarities between the earlier plans and the 2002 plans, but they are very limited, and the disparities are far more prevalent and significant. For instance, in the Stella Link operation, although HPD blocked off the Link Valley apartment complex, a six-block area, it was entry to the complex that was restricted for non-residents. Non-residents were stopped at a checkpoint; residents were issued passes and could pass through the checkpoint without being stopped. This is entirely different from HPD preventing numerous people from exiting a commercial area that they legitimately had entered as invitees. None of the other pre-2002 plans involved cordoning off of geographic areas and detaining those within the boundaries for no individualized reason.

It is also true that certain of the earlier operations invoked the trespass statutes as a law enforcement tool.[36] But, nothing in those plans indicates that HPD detained

---

[36]    HPD used trespass on residential property, and with permission of property managers, in the
(continued...)

groups of people for any material amount of time without individualized suspicion. The pre-2002 plans also saturated the targeted areas with police officers.[37]  However, this practice is not unlawful.  The few similarities are strained and, at best, peripheral to the legal defect in the 2002 operations in issue, *i.e.*, mass detentions without individualized suspicion of any unlawful conduct.

Plaintiffs also argue that HPD personnel's use of the term "zero tolerance" to describe their tactics and goals in various operations, including Stella Link, Gulfton, and the 2002 plans, demonstrates the requisite similarity between the operations, and raises "a reasonable inference that zero tolerance tactics was understood in HPD parlance to include mass detention without individualized reasonable suspicion."[38] Plaintiffs' focus on the term "zero tolerance" is misplaced.  The mere fact that HPD personnel use the label as part of their description of various law enforcement operations is not sufficient to establish similarity to the alleged custom in issue in this case.  The record demonstrates that different officials may well have had different understandings of the term's meaning, with many officials using "zero tolerance" to mean arrests for all visible unlawful activity—a lawful "zero tolerance" policy—and others apparently understanding the term to permit containment of all persons present

---

[36]   (...continued)
Stella Link and Gulfton operations.

[37]   Police saturation was part of HPD's strategy in multiple operations, including Stella Link, Gulfton, Richmond Strip, Operation Renaissance.

[38]   *See Lopez* Supplemental Response [Doc. # 232 in *Lopez*, H-03-2297], at 12.

in an area, followed by individual scrutiny, and ultimately the arrest of all law violators—an unlawful "zero tolerance" practice due to the first feature. The relevant issue is whether the mass detentions at issue in the various operations were justified by officers' observations of unlawful activity or were based on individuals' mere presence at the location. The question thus is whether officers had particularized reasonable suspicion of violations of law before they detained individuals for questioning. Because Plaintiffs' evidence regarding HPD's pre-2002 operations does not demonstrate mass or lengthy detentions without individualized reasonable suspicion, as occurred to Plaintiffs in August 2002, the pre-2002 operations are not relevant to this case. Evidence of these operations is therefore excluded from analysis of the existence of an HPD custom or practice.

## 2.    Conduct During 2002

The Court turns to the issue of whether, as a matter of law, HPD's 2002 plans as executed are sufficiently pervasive and widespread to establish a custom or practice on which municipal liability may be grounded. Plaintiffs rely on various plans proposed and/or executed by HPD in mid-2002. In fact, however, the core events are HPD's June 2002 implementation of the Smith Plan, which plan as written does not contain the unlawful element of mass detentions without individualized suspicion, and the August operations as planned and executed (the Jackson and Game Plans). Thus, the question in this case is whether a practice lasting approximately two

months, with ambiguous prior discussions about the need for HPD's response to a

serious public safety problem, is sufficient to establish a custom or practice under the

circumstances presented.  The Court concludes that Plaintiffs have adduced sufficient

evidence to create a genuine question of material fact as to the existence of a custom

or practice.

In *Bennett v. City of Slidell*, the Fifth Circuit recognized that the determination

of the existence of a custom is fact-specific.[39]

> Sufficient duration or frequency of abusive practices, or other evidence,
> must warrant a finding of knowledge on the part of the governing body
> that the objectionable conduct has become customary practice of city
> employees.  Where the violations are flagrant or severe, the fact finder
> will likely require a shorter pattern of the conduct to be satisfied that
> diligent governing body members would necessarily have learned of the
> objectionable practice and acceded to its continuation.

*Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc). At least one

case has held that, in its specific factual context, a two-and-a-half month period was

sufficient to establish a custom under § 1983.  In *James v. Nocona General Hospital*,

up to twenty-two hospital patients had died, under suspicious circumstances, over a

two-and-a-half month period.  The district court held, on a Rule 12(b)(6) motion, that

the evidence was sufficient for a factfinder to find "such a pattern as to charge the

---

[39]    The analysis here is pertinent both to whether a custom existed at all (discussed in this
Section), and whether City policymakers can be charged with knowledge of the custom
(discussed in Section III.B, *infra*).

hospital or its staff or agents with knowledge."[40]

In light of the severity, duration, and frequency of the alleged violations, as well as "other evidence," *see Bennett*, 728 F.2d at 768, the Court concludes there is a genuine fact issue as to the existence of an HPD custom in 2002 of using mass detention without individualized suspicion as a law enforcement tool. The following, viewed in the light most favorable to Plaintiffs, support this conclusion:

(1)    mass detentions without individualized suspicion occurred on three nights over a two month period;[41]

(2)    HPD was focused on street racing during the summer of 2002, and created and vetted several plans to combat the racing, with the last plans (the Jackson and Game Plans) expressly incorporating mass detentions

---

[40]    *James v. Nocona Gen. Hosp.*, 2004 WL 2002425 (N.D. Tex. Sept. 4, 2004), *aff'd sub nom. Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 255-56 (5th Cir. 2005) (defendants' knowledge that, among other things, the hospital's death rate over a two-month period was at least double the death rate from the same two-month period from the preceding year, is sufficient to allege deliberate indifference). *Cf. Maddux v. Officer One*, 90 F. App'x 754, 776 n.47 (5th Cir. 2004) ("Even the 'short pattern of conduct' that may sometimes prove sufficient to demonstrate a custom when the violations are 'flagrant or severe' does not necessarily contemplate *one* similar incident") (quoting *Bennett*, 728 F.2d at 768) (emphasis original).

[41]    These three HPD mass detentions were on June 15 under the Smith Plan, and on August 16 and 17 under the Jackson/Game Plan. It was clear from after-the-fact descriptions of the June 15 operation that mass detentions had occurred, because 350 vehicles were contained. These results were described in detail to Executive Assistant Chief Breshears, *see* Smith Evaluation (Exhibit 6 to Response), who was in frequent communication with Chief Bradford. Breshears Deposition (Exhibit 10 to Response), at 137 (Breshears kept Bradford apprised of developments through "phone calls and daily meetings"). Not only did HPD leadership not issue an instruction to cease or change the mass detention tactics, but within a month or so, Assistant Chief McClelland approved the Jackson Plan, which called explicitly for mass detention and was executed on August 16 and 17.

into the operation;[42]

(3)     the operations on August 16 and 17 were extensively pre-planned by

HPD;[43] and

(4)     the HPD officers assigned to carry out Operation ERACER believed that

mass detentions were acceptable and had been approved by high-ranking

HPD officials.[44]

Viewed together, and drawing all inferences in Plaintiffs' favor, the incidents

within the summer of 2002 are sufficient to demonstrate a fact question as to whether

---

[42]     During the summer of 2002, HPD also devoted significant time and resources to the street racing problem.  Chief Bradford directed his staff to address the problem and, at the April STAARS meeting, expressed his support for strict enforcement measures.  Over the summer, numerous anti-racing plans and strategies were drafted and vetted within HPD, including the Aguirre Plan, the Smith Plan, the Jackson Plan, and the Game Plan.  Although the Smith Update and the Jackson Plan explicitly discussed mass detentions, followed by individual scrutiny of all present, these reports and plans apparently did not raise eyebrows within HPD.  Thus, there is support for Plaintiffs' argument that mass detentions were custom in 2002 within HPD.

[43]     Operation ERACER on August 16 and 17 was pre-planned by HPD officials, with the extensive involvement of Assistant Chief McClelland.  In most reported cases analyzing whether there is a custom or practice, the questioned action is by line officers spontaneously reacting to particular circumstances, without discussion with higher officials.  *See, e.g., Pineda*, 291 F.3d at 329 (discussing pattern of warrantless entries by HPD officers).  That was not the circumstance here.

[44]     The HPD officers who implemented Operation ERACER understood that their superiors expected mass detentions to occur on August 16 and 17, and that detentions of spectators as well as racers would take place.  The officers also were led to believe that Chief Bradford supported the operation. *See* Counsel's Summary of Officers' Statements and Statements of Sgt. Cain, Sgt. Roberts, Sgt. Zitzmann, Officer McClellan, and Sgt. Maeker (Exhibits A, A-I, A-II, A-III, A-IV, & A-V to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]).

HPD had a custom of mass detention without individualized reasonable suspicion.[45]

### B.   City Policymaker's Actual or Constructive Knowledge of the Custom

Under the second element for § 1983 liability, Plaintiffs must show that a policymaker had actual or constructive knowledge of the relevant custom or policy. As held previously,[46] Chief Bradford is a policymaker for HPD because he was Chief of Police at the time relevant to this suit.  *See Piotrowski*, 237 F.3d at 579 ("the Mayor, City Council, and Chief of Police [are] Houston's presumptive policymakers for the police") (citing *Webster*, 735 F.2d at 842).[47]

---

[45]   The City's attempt to define the custom very narrowly, as detention "pursuant to criminal trespass in an area where businesses were open," MSJ, at 10, and thus presumably to exclude the June 15 operation from consideration, is unavailing.  *See* City of Houston's Reply to Plaintiffs' Supplemental Response to the City Motion for Summary Judgment [Doc. # 233 in *Lopez*, H-03-2297], at 5 (HPD's containment operation on June 15, at 7100 Business Park Drive, occurred at the parking lot of a closed business).  HPD's use of trespass laws may have some relevance to the alleged custom at issue, and the likelihood of wrongful detentions surely was increased by the fact that the operations of August 16 and 17 were carried out in parking lots of open businesses.  Nevertheless, neither of these circumstances is necessary to establish a constitutional violation.  As noted previously, the ultimate question is whether the City carried out mass detentions without individualized reasonable suspicion.

[46]   *See* 2005 M&O, at 23 & n.29.

[47]   It is unclear if one or more Plaintiffs argue that Executive Assistant Chief Breshears and/or Assistant Chief McClelland also are policymakers for HPD for purposes of the street racing initiatives.  The Court therefore does not decide this issue.  Nevertheless, the Court notes that the Fifth Circuit has held that policymaking power may sometimes be delegated.  *Bennett*, 728 F.2d at 769.  Further, Chief Bradford previously testified in deposition "that the Chief of Police and his command staff of assistant chiefs serve as policymakers for HPD."  *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1079 (S.D. Tex. 2000), *modified in part on other grounds*, 291 F.3d 325 (5th Cir. 2002).  The Fifth Circuit in *Pineda* did not analyze the issue, but stated, "The plaintiffs do not allege that the policymakers for the City, the Police Chief and his Assistant Chiefs, had actual knowledge of the pattern . . .."  *Pineda*, 291 F.3d at 330.  *But see Piotrowski*, 237 F.3d at 579 (citing *Webster* and stating that, "without proof," it was (continued...)

As held in the 2005 M&O, Plaintiffs have demonstrated through circumstantial evidence that there is a genuine fact issue regarding Chief Bradford's "actual or constructive knowledge" of the mass detention custom at issue.[48]   The Smith

---

[47]   (...continued)
"inconceivable" that assistant chiefs were policymakers); *Webster*, 735 F.2d at 842 ("There was no proof in this record whatsoever that any police officer subordinate to the Chief even possibly could have occupied the role of a city policymaker.").

Evidence in the record supports the argument that Breshears and McClelland had actual or constructive knowledge in 2002 of an HPD mass detention practice or custom. Breshears is the listed recipient for, and therefore had actual knowledge of, the Smith Evaluation, which recounted in detail HPD officers' mass containment of the public on June 15.  *See Pineda*, 291 F.3d at 330 (actual knowledge may be shown by "receipt of written information"); Exhibit 6 to Response.  Breshears also had actual knowledge of the planned operation on August 16, as established by his receipt of Aguirre's memorandum entitled "Anticipated Mass Arrests from Operation ERACER."  *See* Aguirre Memorandum dated August 13, 2002 (Exhibit C to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]) (memorandum sent to Breshears and McClelland, among others). Aguirre's memorandum states that the first phase of Operation ERACER will be conducted on August 16, targeting street racers "and their followers," and that "we anticipate that the operation will produce mass arrest from the onset."

McClelland was heavily involved in the implementation of Operation ERACER.  He approved the Jackson Plan, received Aguirre's August 13 memorandum anticipating mass arrests and, on August 15, convened a "mandatory planning meeting" for all members of the Operation ERACER task force.  *See* Memorandum from McClelland dated August 12, 2002 (Exhibit D to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]) (announcing mandatory planning meeting for Operation ERACER on August 15); Jackson Plan (Exhibit 7 to Response).  Officers present at the task force meeting have stated that they were instructed by McClelland and Aguirre to detain spectators as well as racers, and to use trespass as an enforcement tool.  *See* Counsel's Summary of Officers' Statements and Statements of Sgt. Cain, Sgt. Roberts, Sgt. Zitzmann, Officer McClellan, and Sgt. Maeker (Exhibits A, A-I, A-II, A-III, A-IV, & A-V to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].

[48]   *See* 2005 M&O, at 49-52; *Pineda*, 291 F.3d at 330 (discussing standards for actual and constructive knowledge of a policymaker).  It is uncontradicted that Chief Bradford had actual knowledge of the rejected Aguirre Plan and the Smith Update because both were addressed to him. *See Pineda*, 291 F.3d at 330 (actual knowledge may be shown by "receipt of written information").  However, because neither plan explicitly called for detentions without individualized suspicion, these facts alone cannot establish Chief Bradford's
(continued...)

Evaluation, which reported the mass detentions on June 15, was addressed to
Breshears, to whom Chief Bradford specifically had delegated authority to address
the street racing problem.[49]  The evidence indicates that Breshears and Chief Bradford
generally maintained close communications, such as daily meetings as needed; that
extensive resources were required to implement Operation ERACER, which supports
the inference that Chief Bradford would have been aware of the planned operation;
and that McClelland, who was required to obtain Breshears' approval before
implementing any street racing operation, told Chief Bradford and Breshears that he
was going to run such an operation.[50]  McClelland then approved the Jackson Plan,
which called explicitly for mass detentions followed by individual scrutiny on the
dates in question,[51] and subsequently conducted the August 15 task force meeting
during which HPD officers received instructions for implementing Operation

---

[48]     (...continued)
         knowledge of the custom.

[49]     *See* Bradford Deposition (Exhibit 9 to Response), at 97-98 (Bradford delegated the street
         racing problem to Breshears, and Breshears "had the authority to approve or reject those
         strategies at his level," without going to Bradford, as long as the strategies complied with the
         Smith Plan's model); Breshears Deposition (Exhibit 10 to Response), at 137 (based on his
         communication with Bradford, Breshears thought he was fully within his authority to make
         a decision on the Smith Plan or the Aguirre Plan; Breshears kept Bradford apprised of
         developments through "phone calls and daily meetings").

[50]     *See* 2005 M&O, at 49-52.

[51]     *See* Exhibit 7 to Response.

ERACER.[52]  Officers present at the task force meeting report that they were told or

led to believe that Chief Bradford had approved the planned mass detentions.[53]

When this evidence is viewed in the light most favorable to Plaintiffs, a jury

could reasonably conclude that Chief Bradford had actual or constructive knowledge

of an HPD custom of mass detention without individualized reasonable suspicion.[54]

Summary judgment on this issue is unwarranted.

### C.   Moving Force Behind Deprivation of Plaintiffs' Constitutional Rights

The City argues that Plaintiffs have no evidence that "the Jackson Plan or any

custom" was the moving force behind the constitutional violations at issue.  Rather,

the City argues, the constitutional violations were caused by the Game Plan, which

shifted the focus from street racers to racing spectators through use of trespass laws,

and was not approved by a City policymaker.  MSJ, at 12-13; Reply, at 6.

Although the City attempts to shift the Court's focus to the Game Plan, the

focus for this summary judgment motion must remain on the alleged custom of mass

detention without individualized reasonable suspicion.  Plaintiffs have successfully

---

[52]   *See* Exhibit D to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125].

[53]   *See* Counsel's Summary of Officers' Statements and Statements of Sgt. Cain, Sgt. Roberts, Sgt. Zitzmann, Officer McClellan, and Sgt. Maeker (Exhibits A, A-I, A-II, A-III, A-IV, & A-V to *Cory/Ross* Supplemental Response [Doc. # 183 in *Cory*, H-03-0125]).

[54]   The time period at issue here is relatively short but, given all of the facts discussed above, is sufficient to create a genuine fact issue regarding the City policymakers' actual or constructive knowledge of the custom.  *See supra* Section III.A.2 (citing *Bennett*, 728 F.2d at 768, and other cases).

demonstrated a genuine fact question as to whether a custom of unconstitutional detention existed in 2002, with the actual or constructive knowledge of a City policymaker, and whether HPD acted pursuant to that custom on August 16 and 17. Given that Plaintiffs were detained by HPD on August 16 or 17 as part of the custom Plaintiffs have alleged, a fact question also exists as to whether the custom was the moving force behind the violations of their constitutional rights. *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains").[55]

## IV.   <u>CONCLUSION</u>

Plaintiffs have demonstrated genuine issues of material fact sufficient to defeat summary judgment on the theory that HPD in 2002 had a custom or practice of detaining masses of people without individualized suspicion.  It is therefore

**ORDERED** that the City of Houston's Motion for Summary Judgment [Doc. # 216 in *Lopez*, H-03-2297] is **DENIED**.  However, only the plans and operations

---

[55]   Although the City presents argument regarding deliberate indifference, *see* MSJ at 11-12 ("Plaintiffs have no evidence of deliberate indifference by Bradford. . ."), the issue is not relevant to the pending motion.  Deliberate indifference applies when courts analyze constitutional violations caused by a facially constitutional policy. S*ee Brown*, 520 U.S. at 407; *Piotrowski*, 237 F.3d at 579.  By contrast, the custom alleged by Plaintiffs here—mass detention without individualized reasonable suspicion—is *per se* unconstitutional. Deliberate indifference also applies in analysis of claims of a municipality's failure to train or supervise its police officers, *see Pineda*, 291 F.3d at 331-32, which is not relevant to this motion.

during 2002 will be considered relevant to the alleged custom of mass detention without individualized reasonable suspicion.

SIGNED at Houston, Texas, this **14th** day of **February, 2008**.


Nancy F. Atlas
United States District Judge